1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

9
10
11

| DANIEL WILLIAM MAY, | Civil No.   14cv2038-BEN (JMA) |
|---|---|

Petitioner,

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE:**

vs.

**(1)  DISMISSAL OF KAMALA HARRIS AS RESPONDENT;**

ERIC ARNOLD, Warden, and KAMALA HARRIS, California Attorney General,

**(2)  DENIAL OF REQUEST FOR AN EVIDENTIARY HEARING; and**

Respondents.

**(3)  DENIAL OF PETITION FOR A WRIT OF HABEAS CORPUS**

19
20

This Report and Recommendation is submitted to United States District Judge Roger T.

21   Benitez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

22   District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Daniel William May (hereinafter "Petitioner"), is a California prisoner proceeding pro

26   se and in forma pauperis with a Petition for a Writ of Habeas Corpus filed pursuant to

27   28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner challenges his San Diego County Superior Court

28   convictions of first degree murder and conspiracy to commit murder, accompanied by firearm

use findings, for which he was sentenced to 50 years-to-life in state prison. (Pet. at 1-2.[1]) He alleges here, as he did in state court, that his federal Constitutional rights were violated by the denial of his motion for acquittal at the close of the prosecution's case-in-chief (claim one); jury instructional error (claim two); the presence of a biased juror (claim three); erroneous admission and consideration of jury deliberative processes in denying a motion for a new trial alleging juror bias (claim four); erroneous imposition of a life sentence on the firearm use enhancement (claim five); and ineffective assistance of appellate counsel (claim six). (Id. at 15-38.) He claims an evidentiary hearing is necessary to determine whether any error, or their cumulative effect, warrants habeas relief (claim seven). (Id. at 39-41.)

Respondent has filed an Answer with an attached Memorandum of Points and Authorities in Support, and has lodged portions of the state court record. (ECF No. 13.) Respondent contends claim two is procedurally defaulted due to the failure of trial counsel to object to the alleged error, and that the state court adjudication of all claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Memorandum of P&A in Support of Answer ["Ans. Mem."] at 17-30.) Respondent also contends an evidentiary hearing is not warranted, and that Kamala Harris, the California Attorney General, is not a proper respondent to this action and should be dismissed. (Id. at 17, 30-31.)

Petitioner has filed a Traverse. (ECF No. 17.) He admits he improperly named the California Attorney General as a respondent, argues any default of Claim 2 was caused by ineffective assistance of counsel, repeats his request for an evidentiary hearing, and argues his claims are meritorious. (Traverse at 2-17.)

For the following reasons, the Court finds habeas relief is unavailable because Claim 2 is procedurally defaulted and fails on the merits, and because the adjudication of the remaining claims by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court also finds an evidentiary hearing is neither necessary nor warranted, and the California Attorney General is

---

[1] Pleading citations are to pages assigned by the Court's Electronic Case Filing ("ECF") system.

not a proper respondent to this action.  Accordingly, the Court **RECOMMENDS** Kamala Harris be **DISMISSED** as a named respondent, Petitioner's request for an evidentiary hearing be **DENIED**, and the Petition be **DENIED**.

## II.

## STATE PROCEEDINGS

In an Amended Indictment filed in the San Diego County Superior Court on December 3, 2007, Petitioner and his co-defendant George Berardi were charged with one count of conspiracy to commit murder in violation of California Penal Code section 182(a)(1) and one count of first degree murder in violation of Penal Code section 187(a).  (Lodgment No. 1, Clerk's Tr. ["CT"] at 1715-18.)  The indictment contained sentence enhancement allegations that Petitioner personally discharged a handgun and proximately caused great bodily injury and death within the meaning of Penal Code section 12022.53(d), that Petitioner personally used a firearm within the meaning of Penal Code section 12022.5(a), and that Berardi was armed with a firearm within the meaning of Penal Code section 12022(a)(1).  (Id.)

On January 22, 2009, a jury found Petitioner and Berardi guilty on both counts and returned true findings on the sentence enhancement allegations.  (CT 2170-72; Lodgment No. 4, Reporter's Tr. ["RT"] at 1928-29.)  A hearing on a new trial motion alleging juror misconduct was held in April 2009, during which six of the twelve seated jurors testified; the motion was denied on May 21, 2009.  (CT 2180-82; RT 1960-2025.)  A renewed motion for a new trial alleging the trial court failed to conduct an adequate hearing on the allegations of juror bias was denied on October 30, 2009.  (CT 2187; RT 2031-38.)  On November 30, 2009, Petitioner was sentenced to 25 years-to-life on the murder conviction, and received a consecutive term of 25 years-to-life for the firearm enhancement.  (CT 2191.)

On November 14, 2011, Petitioner filed an appeal presenting, *inter alia*, Claims 2 and 3 raised here.  (Lodgment Nos. 8-11.)  The appellate court consolidated the appeal with Berardi's appeal and affirmed.  (Lodgment No. 12, People v. Berardi, et. al, No. D056544, slip op. (Cal.Ct.App. Jan. 12, 2012).  On February 14, 2012, Petitioner filed a petition for review in the state supreme court presenting, *inter alia*, Claims 2 and 3 raised here.  (Lodgment No. 14.)  His

petition for review was consolidated with Berardi's, and they were denied by an order which stated: "The petitions for review are denied." (Lodgment No. 15, <u>People v. Berardi</u>, No. S200061, order at 1 (Cal. April 11, 2012).)

On April 16, 2013, Petitioner filed a habeas petition in the trial court presenting Claims 1, 4, 5 and 6 raised here. (Lodgment No. 16.) That petition was denied on May 31, 2013. (Lodgment No. 17, <u>In re May</u>, No. HC21264, order (Cal.Sup.Ct. May 31, 2013).) On August 8, 2013, Petitioner filed a habeas petition in the state appellate court raising the same claims. (Lodgment No. 18.) The appellate court denied the petition in a written order. (Lodgment No. 19, <u>In re May</u>, No. D064374, order (Cal.App.Ct. Aug. 23, 2013).) On November 4, 2013, Petitioner filed a habeas petition in the state supreme court raising the same claims. (Lodgment No. 20.) That petition was summarily denied on June 18, 2014. (Lodgment No. 21.)

## III.

### TRIAL COURT PROCEEDINGS

Birdia Kegler testified that her son Marcus Kegler was born in Mississippi in 1984, they moved to San Diego in 1994, and moved back to Mississippi in 1999 or 2000. (RT 516-18.) In the spring of 2005, Marcus traveled to San Diego intending to stay two weeks to visit his high school girlfriend Desiree Winchell, but was shot to death in San Diego. (RT 518-19.)

Emilio Ramirez, a San Diego police officer, testified that at 6:18 p.m. on July 8, 2005, he responded to a call of a man lying in the street. (RT 521-23.) He and his partner officer Chris Larsen arrived at a cul-de-sac near 3549 Castle Glenn Drive about 6:23 p.m., where a black male in his mid to early 20's was lying on a walkway which ran from the cul-de-sac to a nearby recreation center. (RT 524-25, 531.) Marcus Kegler was lying in a pool of blood, with dried blood on his clothes and shoes, was incoherent, and kept repeating: "I fell, I fell." (RT 532, 526.) Officer Ramirez did not notice Marcus had been shot, and neither did the paramedics who arrived at 6:53 p.m. (RT 528.) At 7:13 p.m., Ramirez was informed a CAT scan at the hospital revealed Marcus had a gunshot wound to the head, and he secured the scene. (RT 529.)

Rusty Nelson, a San Diego police officer, testified that he and his partner officer Danny Bihum responded to a report of a gunshot victim at 7:15 p.m. on July 8, 2005. (RT 539-40.)

About 8:00 p.m., Desiree Winchell approached Officer Nelson and said she was looking for her boyfriend Marcus Kegler, and was worried because she had not seen him recently.  (RT 541-43.) William Hudson, Marcus's uncle, also approached Officer Nelson; Desiree became hysterical when Nelson told her Marcus had been shot and was at the hospital.  (RT 542-43.)  Officer Nelson asked Desiree if she knew anyone, such as an ex-boyfriend, who might want to hurt Marcus, and she took the officers to a nearby apartment.  (RT 543.)

Anna Tong lived at the apartment, and when she answered the door, Officer Nelson saw Petitioner's co-defendant George Berardi inside.  (RT 543-44.)  Officer Nelson spoke to Berardi while Officer Bihum separately spoke to Tong; they both said they had been to a 7-Eleven store and a Round Table Pizza restaurant and had returned five minutes earlier.  (RT 544-45, 554-55.) Berardi said he recently moved to San Diego from Los Angeles and was staying with Tong until he could find an apartment, and that Marcus Kegler had contacted him several times that day because Marcus was "looking to score some dope."  (RT 555-56.)  Berardi said he spoke to Marcus at 5:41 p.m., and told Marcus he "could not help him get any weed."  (RT 556.)  They spoke again at 5:51 p.m., while Berardi and Tong were on their way to the 7-Eleven, and Berardi again told Marcus he could not get him any weed.  (RT 557.)  Officer Nelson said Berardi was very cooperative and showed him his cellphone which listed those calls.  (RT 557-58.)

David Dolan, a San Diego homicide detective, interviewed Berardi about midnight on the night of the shooting.  Berardi spoke to the detective openly and voluntarily.  He told the detective that his ex-girlfriend Desiree had left him for Marcus, and that earlier in the day Marcus and Berardi had negotiated a deal for a quarter-pound of marijuana.  (RT 560-63, 583-84.)  Berardi said he was upset with Desiree because she had been flirting with Marcus over the telephone while Berardi was present, and Berardi was "tired of Desiree throwing it in his face regarding her talking to Marcus on the phone."  (RT 564-66.)  Berardi said that about seven months before the shooting Marcus called the house where Berardi, Desiree and Petitioner were living and threatened Berardi, saying: "You got to knock this off or I have somebody down in San Diego that can take care of you."  (RT 572-73, 575.)  Berardi said Petitioner also felt threatened, that they believed Marcus had ties to a Crips street gang, and that Marcus once took

Berardi to a Crips hangout.  (RT 573.)  Berardi told Detective Dolan that Petitioner may have been involved in the shooting, and that Petitioner was in Las Vegas, but was willing to turn himself in to help Berardi.  (RT 574-93.)

William Hudson testified that he lived in an apartment at 3463 Castle Glenn Drive, and that Marcus Kegler, his nephew through marriage, came to live with him in May 2005.  (RT 600-01.)  Marcus sold vacuum cleaners and time-share resorts, and dated Desiree Winchell.  (RT 602-03.)  Hudson spoke to Marcus on July 8, 2005, about 4:30 p.m., and Marcus agreed to meet him at a movie theater that evening, but never arrived.  (RT 603-04.)  When Hudson returned from the theater about 7:00 p.m., Desiree was inside his apartment, which was unusual.  (RT 604-05.)  Desiree told Hudson that Marcus had left half an hour ago, and she did not know when he would be back or where he went.  (Id.)  Just after Desiree left to babysit her cousin's baby, her friend Rochella called and asked to speak to Desiree or Marcus.  (RT 605-06.)  Hudson went up the street to look for Desiree and saw a police car at the cul-de-sac with Desiree sitting on a curb crying.  (RT 606.)  Desiree told Hudson that Marcus had been shot, and Hudson allowed the police to search his apartment, which revealed nothing, and to check the caller I.D. on his telephone, which showed that Berardi had called that night at 5:51 p.m.  (RT 606-08.)

Steven Zanini testified that he sells vacation packages to time-share resorts from an office in Mission Valley, and Marcus Kegler had been doing the same job for about two weeks as of July 8, 2005.  (RT 609-11.)  Zanini gave Marcus a ride home from work that day, dropping him at his uncle's apartment about 4:30 p.m.  (RT 611, 614.)  During the trip, Marcus said he planned to buy marijuana later that day from his girlfriend's ex-boyfriend.  (RT 613.)  Zanini said he told Marcus: "That's probably not a very good idea. Do you know this guy?", but Marcus just laughed and said he "was cool with the guy" and "had no beef with him."  (RT 616.)

John Young, a San Diego homicide detective, responded to the scene of the shooting about 10:15 p.m. on July 8, 2005.  (RT 627-28.)  He supervised the collection of blood samples and a .25 caliber cartridge casing.  (RT 633.)  Security camera video from a nearby business showed a man wearing a dark top and light pants approach the crime scene on foot at 6:15 p.m.; he is seen running from the scene at 6:17 p.m., and is seen coming back to the scene ten minutes

later.  (RT 697-99.)  Security camera videotape from a 7-Eleven store eight-tenths of a mile from the crime scene showed Berardi at the store at 5:55 p.m.  (RT 701-02.)

Petitioner purchased a ticket at the Greyhound bus station in downtown San Diego with cash and without a reservation at 12:45 a.m. on July 9, 2005, and boarded a bus to Las Vegas, Nevada, at 6:30 a.m. that day.  (RT 618-23.)  Detective Young said that when Petitioner was contacted by telephone in Las Vegas on August 31, 2005, he admitted shooting Marcus Kegler; a recording of that call was played for the jury and a transcript is in the record.  (RT 703-06; CT 365-87.)  On September 23, 3005, Petitioner participated in a video reenactment of the crime. (RT 706.)  The video was played for the jury and a transcript is in the record.  (RT 711; CT 388-94.)  Petitioner said he was wearing a dark sweater or a flannel jacket with light-colored pants when he met Marcus and handed him a quarter pound of marijuana.  (CT 392; RT 751.) Petitioner became nervous because Marcus asked a lot of questions, such as the amount and price of the marijuana, which in Petitioner's experience should already have been known by a drug purchaser.  (CT 392.)  Petitioner said Marcus was quiet for about 45 seconds, apparently weighing something in his mind, and Petitioner saw "something behind his eyes which made me very, very uncomfortable."  (CT 392-93.)  When Marcus made a motion towards his pocket it "freaked [Petitioner] out," so Petitioner pulled a gun and shot Marcus while holding the gun at shoulder height.  (CT 393; 720-21.)  Petitioner said he ran to Anna Tong's apartment where he got rid of the sweater he was wearing in case it had any blood on it, and when he realized he had left the marijuana, he ran back and picked it up.  (CT 393-94; RT 734-36.)  Petitioner showed the police where he had thrown the gun into San Diego Bay at Seaport Village, and said he had acted alone in the shooting.  (RT 711, 741.)  Detective Young learned that Nate Green had supplied the marijuana, and that Green was living with Anna Tong at the time.  (RT 759.)

Marcus Kegler died of a gunshot wound to the head.  (RT 642-50.)  An autopsy of Marcus, who was six feet, one and one-half inches tall and weighed 150 pounds, revealed a small-caliber bullet in his brain which had entered the skull on his right side and moved toward the left side with a slight downward trajectory.  (RT 644-48, 653.)  He was shot from at least two feet away, and had $104.11 on his person.  (RT 781-82, 789-91.)

Rochella Wiggins testified that she became friends with Marcus Kegler and Desiree Winchell when they attended high school, that Marcus and Desiree were romantically involved, and that Wiggins stayed in touch with Marcus after he moved to Mississippi.  (RT 658-60.) Wiggins also hung out with Petitioner and Berardi, and said Berardi and Desiree were in a dating relationship.  (RT 660-62.)  Wiggins helped Desiree and Marcus communicate with each other beginning in January 2005 by arranging three-way telephone calls between them.  (RT 661-62.) Wiggins helped Desiree arrange for Marcus to visit San Diego after Desiree's relationship with Berardi ended.  (RT 663.)  After Marcus arrived, he found a job and decided to stay in order to earn enough to help Desiree with her bills and eventually move in with her.  (RT 664.)

Wiggins said Berardi and Desiree went to Los Angeles in May 2005, and shortly after that trip Wiggins received an early morning telephone call from Berardi saying he was concerned about Desiree's whereabouts.  (RT 665.)  Berardi told Wiggins during that call that he and Desiree "had plans to go run away somewhere," which confused Wiggins because Marcus and Desiree both told her they had plans to travel to Las Vegas and get married.  (RT 665-67.)  On July 8, 2005, Wiggins, Marcus and Desiree planned to bake a birthday cake at Wiggins' house, and Marcus was supposed to meet Berardi and "pick up a sack of marijuana" to bring along.  (RT 667-68.)  Wiggins said she had concerns about Marcus and Berardi doing business together, and she told Marcus that Berardi was obviously not happy about Marcus and Desiree being together, but Marcus told Wiggins the marijuana purchase was a good deal.  (RT 669.)

Wiggins received a voicemail message from Desiree at 6:55 p.m. on July 8, 2015, stating: "Hi, you need to call me back ASAP. I have a really bad feeling. I went outside (unintelligible)." (RT 670-72; CT 365.)  When Wiggins called Desiree back, Desiree said she did not know where Marcus had gone and was not sure when he would be back.  (RT 672.)

Michael Bowen testified that on July 8, 2005, he arrived at Nate Green's apartment between 6:00 and 6:20 p.m., and purchased a quarter ounce of marijuana from Green.  (RT 763-66.)  Bowen said he frequently purchased small quantities of marijuana from Green and the atmosphere at Green's apartment had always been relaxed, but this time it was tense.  (RT 772-

73.)  As Bowen was leaving, a tall man gave him a flannel jacket and asked him to throw it in the dumpster.  (RT 767.)  Bowen took the jacket and left it in a parking lot expecting a homeless person might take it; he did not notice any blood on the jacket.  (Id.)

Anna Tong testified that in July 2005 she lived with her boyfriend Nathaniel Green and her son Vincent in an apartment near where Marcus Kegler was killed.  (RT 830.)  She said Berardi was one of Green's friends, and that Berardi dated Desiree Winchell but they broke up before Marcus was killed, although Berardi told Tong he and Desiree still loved each other.  (RT 832-33.)  Tong said Petitioner and Berardi lived together and were friends, and although she had never met Marcus, Berardi told her that Marcus and Desiree were dating and Berardi: "Wasn't too happy about it."  (RT 834-35.)  Several weeks before the shooting, Petitioner and Berardi moved out of their apartment and were staying at Tong's apartment, which Tong said she was not happy about, as neither of them was working.  (RT 835-36.)

On July 8, 2005, Berardi invited Tong to go out for bread sticks and beer, which surprised her because it was unusual for the two of them to go anywhere together without one of the others coming along.  (RT 838-39.)  They left in Tong's car about 5:45 p.m., and while driving Berardi received a telephone call from Marcus during which they discussed a marijuana deal to take place at the cul-de-sac where Marcus was later found.  (RT 841.)  They drove to a 7-Eleven store, where Berardi purchased a drink, and then to the Round Table Pizza restaurant where they had beer and bread sticks.  (RT 843.)  Berardi told Tong he was saving his receipts for an alibi, and was using Tong as an alibi, because Petitioner was going to shoot Marcus over "something to do with Desiree."  (RT 844-48.)  Berardi told Tong not to tell anyone, and that he had stalked Marcus and knew where he worked and knew his routine.  (RT 847.)  Tong was shocked and did not believe it, but Berardi received a telephone call from Petitioner while they were at the restaurant and she overhead Petitioner say "the pizza has been delivered."  (RT 848-50.)  Berardi told her they had to stay at the restaurant until the coast was clear.  (RT 850-51.)

When they returned to Tong's apartment there was police activity in the area, and a police officer knocked on the door and asked to speak to her and Berardi.  (RT 851-52.)  When they went outside, Tong saw Desiree crying.  (RT 853.)  Tong did not tell the police at that time about

what Berardi said at the restaurant because she did not want to get involved.  (RT 860.)  When she returned to her apartment, she found Petitioner hiding in a closet.  (Id.)  Petitioner broke down crying and said he had shot Marcus in the head at close range and was sorry.  (RT 862-63.) Tong admitted she did not tell the police the truth until months later, after she had been prompted to do so by Nate Green's father, and after her request for immunity had been declined.  (RT 864-69.)  Tong testified that she thought Berardi was responsible for the killing because he had instilled paranoia in Petitioner and had arranged for Petitioner and Marcus to be together in a dangerous situation where one wrong move could be interpreted as hostile.  (RT 933-35.)  Tong said Berardi told her that Crip gang member friends of Marcus had threatened Berardi's life, and that Petitioner felt similarly threatened due to his friendship with Berardi.  (RT 980-83.)  Tong also testified that Berardi told her Desiree had masterminded the shooting and that Desiree was still Berardi's girlfriend at the time of the shooting.  (RT 1023, 1031.)

Desiree Winchell testified that she became friends with Marcus Kegler and Rochella Wiggins when they were 14 years old, living in San Diego and going to high school.  (RT 1060.) Desiree began dating Marcus just before he moved to Mississippi, but they decided not to have a long distance relationship.  (RT 1061.)  She began a five-year dating relationship with George Berardi in 2000, and in May 2004, rented a house in Rolando where they lived with Petitioner, Berardi's best friend.  (RT 1062-64.)  Desiree said she and Marcus kept in touch right after he moved to Mississippi, but when she told Marcus that her relationship with Berardi had become serious, Marcus "backed off" and they did not often speak again.  (RT 1063.)

Desiree said her relationship with Berardi had deteriorated by December 2004, and she decided to end the relationship in January 2005.  (RT 1064-65.)  She remained living with Berardi and tried to be civil, and agreed to give him until July 4, 2005, to get a job and show her he was going to be a different person, but nothing changed and they argued frequently.  (RT 1065-66.)  Desiree said Marcus called her out of the blue in January 2005, and they thereafter began talking on a regular basis regarding how unhappy Desiree felt.  (RT 1066.)  Marcus had a girlfriend at that time, but he agreed to listen to Desiree and help her with her relationship. (RT 1067.)  Berardi was not happy that she and Marcus were speaking, and the telephone calls

stopped, but they continued to communicate by letter and three-way telephone calls initiated by Wiggins. (RT 1067-68.)  In April 2005, when Desiree moved out of the house she was sharing with Berardi into her mother's house, Berardi was upset and smashed Desiree's cell phone, pinned her down, and told her she was not going to move out. (RT 1069.)

Desiree purchased an airline ticket for Marcus to come for a week's visit, but when Marcus came to San Diego on May 8, 2005, he decided to stay longer and moved in with his uncle. (RT 1068-70.)  They resumed their relationship, which started out easygoing but became serious. (RT 1070.)  Desiree ended up with a box of items belonging to Berardi after she moved out, and Berardi said he would come by in a couple of days to pick it up, but he showed up at her mother's house two or three hours later. (RT 1071.)  Marcus was at the house when Berardi arrived, and Berardi acted as if he had something to say to Marcus; when Desiree told Berardi if he had something to say to Marcus he should do so himself, Berardi replied:  "I have nothing to say.  I have plenty to do," and sped off in his car. (RT 1072.)  Berardi called Desiree about five minutes later, told her Marcus should not be at her mother's house, and screamed at Desiree, whereupon Marcus took the phone and he and Berardi shouted at each other for five to ten minutes, during which they threatened each other. (RT 1072-73.)

Desiree knew that Marcus and Berardi had discussed a marijuana deal when Marcus first came to San Diego, but when she discovered a few days before the shooting that the deal was still on, she told Marcus it was a bad idea to deal with Berardi, as Berardi had threatened to kill Marcus at least twice. (RT 1074-75.)  Desiree took a trip to Los Angeles with Berardi in late May 2005, and said she went because she was afraid Berardi would kill Marcus otherwise. (RT 1076-77.)  Berardi asked Desiree to marry him during that trip, but when asked if she had agreed to marry him, she responded:  "I don't think so." (RT 1078.)  When she returned, Marcus asked her if she would go to Las Vegas and marry him, and she agreed. (RT 1079-80.)

On July 8, 2005, Desiree met Marcus at his uncle's apartment about 5:30 or 6:00 p.m., and they had plans to go to Rochella's house in Escondido to bake a birthday cake for Rochella's daughter. (RT 1080-81.)  Desiree called Rochella, her best friend, and left a voicemail message at 5:35 p.m.; Marcus left his uncle's apartment at 6:15 p.m. and told Desiree he would be right

back.  (RT 1082.)  Desiree fell asleep and awoke at 6:45 p.m., but Marcus had not returned so she left him a note saying she was out looking for him and would be right back.  (RT 1083-84.)  She saw an ambulance in the cul-de-sac but did not inquire, and went back to Marcus's uncle's apartment.  (RT 1089-90.)  She said she started to get a bad feeling and began to hyperventilate, so she called Rochella at 6:55 p.m. and left her another message.  (RT 1090.)  Marcus's uncle returned and said he would wait for Marcus while Desiree picked up Rochella's daughter, but as she left she asked a police officer if he had seen Marcus, and was told that Marcus had been shot in the head.  (RT 1090-92.)  Desiree told the police that Marcus had no enemies, that the only person he did not get along with was Berardi, and she told them of the situation between Marcus and Berardi.  (RT 1092.)  Desiree had heard rumors that Berardi and Petitioner were staying with Anna Tong, and she led the police to Tong's nearby apartment.  (RT 1093.)

Desiree said that after Marcus died, Berardi consistently attempted to get back together with her, but she never dated him again.  (RT 1094.)  On cross-examination, Desiree said Berardi told her he was upset with Marcus because Marcus had sent people to  hurt him, that Berardi and Marcus both said they had made amends, and that Marcus was smoking a lot of marijuana around that time so his purchase of a quarter pound was not unusual.  (RT 1098-99.)

Nathanal Green testified he had never met Marcus Kegler, that he was in a relationship with Anna Tong in 2005, and spent most of his time at her apartment.  (RT 1132-33.)  Tong's three or four-year old son was living with them, and Green shared childcare responsibilities with Tong.  (RT 1133-34.)  Green was friends with Petitioner and Berardi, and had been to visit them when they lived in a house in Rolando with Desiree Winchell.  (RT 1135.)  In early 2005, Green heard mention of a "25" at the Rolando house.  (RT 1137.)  At the end of June 2005, Green helped Petitioner and Berardi move from Los Angeles back to San Diego, and they stayed at Anna Tong's apartment.  (RT 1136-38.)  Tong eventually asked Berardi to move in with them in order to help pick her son up from school because Green planned to move out.  (RT 1138-39.)  About a week before July 8, 2005, Berardi told Green that Marcus wanted marijuana, and Berardi asked Green to supply Berardi with marijuana for Marcus.  (RT 1168-71.)  Green told

1   Berardi that he did not think it was a good idea for Berardi to be involved with Marcus because

2   Green had heard that Marcus had made death threats against Berardi.  (RT 1171.)

3          On July 8, 2005, at a little before 6:00 p.m., Green was at home at Tong's apartment with

4   Bart Cameron when Petitioner asked for a quarter pound of marijuana, which Green said would

5   sell for about $140.  (RT 1171-75, 1204.)  Green gave it to Petitioner, and Petitioner left and

6   returned about 15 or 20 minutes later.  (RT 1176-77.)  Although he could not remember at trial,

7   Green previously told the police that when Petitioner returned he made a telephone call and

8   Green heard him say something about a pizza having been delivered.  (RT 1177-80.)  Green got

9   the quarter pound of marijuana back about 8:30 or 9:00 p.m. that night, about an hour or two

10  after the police came to the door asking to speak to Berardi and Tong.  (RT 1183-84.)  Green

11  said Petitioner was hiding in a closet in the apartment that evening, and Green heard Berardi say

12  Petitioner had "sealed my fate" or words to that effect.  (RT 1185-88.)  Later that evening Green

13  drove Petitioner downtown, accompanied by Bart Cameron.  (RT 1189.)  Green said Petitioner

14  gave the jacket he was wearing that night to a man named Michael.  (RT 1216-17.)  Green said

15  Tong was upset with Berardi because she did not like Green and Berardi spending time with

16  each other, as there were other women around on those occasions, and that Tong was a malicious

17  and vindictive person with "no boundary she wouldn't cross to get [Berardi] in trouble to keep

18  you away from him."  (RT 1220-37.)  The People rested.  (RT 1290.)

19         The defense made a motion for acquittal based on the Toledo doctrine.[2]  (CT 350-56.)

20  Petitioner argued, as he does in Claim 1 here, that the prosecution was bound by his statements

21  that the killing was a justifiable homicide because his statements were the only direct evidence

22  of how the killing occurred and were not contradicted by competent and substantial evidence.

23  (Id.)  The trial judge found there was competent and substantial evidence which could establish

24  guilt apart from Petitioner's statements, and denied the motion.  (RT 1342-43.)

25

26  _____

27      [2]  Referring to People v. Toledo, 85 Cal.App.2d 577 (1948).  "The Toledo doctrine obviates a
    defendant's burden of proving a defense when the prosecution's proof itself tends to show the defense,
28  and there is no other competent and substantial evidence to the contrary."  (Lodgment No. 17, In re May,
    No. HC21264, order at 3-4.)

Petitioner's defense attorney called a witness who lived near where the shooting took place and heard a loud crack about 6:00 p.m. on July 8, 2005. (RT 1290-96.) Michelle Burkheart worked with Petitioner for about four months in Las Vegas in 2005, and said Petitioner was an honest person. (RT 1300-01.) She said when Petitioner was informed that the man he shot and killed on July 8, 2005 had been unarmed, he was distraught because he thought the man was armed. (RT 1303.) Marc Burkheart testified that Petitioner had worked as a general laborer in Las Vegas for him and his wife, and that he was a good worker and a trustworthy person. (RT 1327.) A paramedic who responded about 6:29 p.m. testified that Marcus was unable to cooperate, and had abrasions, dried blood on his clothing, and ants crawling on his body, which suggested he had been lying there for as long as 30 minutes. (RT 1310-22.)

Lucas Irwin testified that he was married to Anna Tong for two years from 1999-2001, and they have a child named Vincent. (RT 1332.) Once during their marriage Tong threatened to kill herself and Vincent, and a third person present called the police. (RT 1332-33.) Irwin was arrested for battery on that occasion and admitted he had pushed Tong several times in self defense when she attacked him, but said the charges were later dismissed at Tong's request. (RT 1333-34.) Irwin said that during custody proceedings Tong falsely stated that he had held a knife to her throat during that incident and falsely accused him of being addicted to gambling, drugs and sex; he opined at trial that she is a vindictive and untruthful person. (RT 1334-35.)

John Jones testified that he was good friends with Petitioner and Berardi in 2005, when he lived near them in Rolando, and that Petitioner and Berardi were close friends and looked out for each other. (RT 1351.) Jones said Petitioner and Berardi were nonviolent and trustworthy. (RT 1354, 1363.) He said that when Desiree Winchell broke up with Berardi, it seemed that Desiree could not decide whether she wanted to be with Marcus or Berardi, and Berardi told Jones that Desiree often called Marcus late at night. (RT 1357.)

Bartholomew Cameron testified that on the afternoon of July 8, 2005, he arrived at Nate Green's apartment, and saw Anna Tong, her son Vincent, Berardi and Petitioner. (RT 1371-73.) Cameron hung out at the apartment smoking marijuana and playing video games, and said at one

point Petitioner left with: "A big chunk of weed." (RT 1373, 1382.) Petitioner came back, left again, came back again, and took a shower before the homicide detectives arrived. (RT 1410, 1416.) Tong and Berardi had gone to get something to eat, and when they returned they were acting oddly. (RT 1377-78.) When the homicide officers knocked on the door after Tong and Berardi returned from eating, Petitioner ran into the bedroom and hid in a closet. (RT 1378, 1395-96.) Cameron said he left with Petitioner, Berardi and Green between 8:00 and 10:00 p.m., and they drove downtown where Cameron and Petitioner were dropped off near the Greyhound bus station; Cameron said Petitioner was very well composed at that time, and was planning to go to Las Vegas. (RT 1382-84, 1396-97.)

Frank Panessa, a licensed private investigator, interviewed Anna Tong and Nate Green on April 27, 2006. (RT 1426-28.) Tong said that while she and Berardi were at the Round Table Pizza restaurant, Berardi said she was going to be his alibi and Petitioner was going to kill Marcus. (RT 1435-38.) Green said the reason Petitioner went back to pick up the marijuana was because Green had supplied it and his fingerprints might be on the package. (RT 1439.) Tong said Green neglected his fatherly duties with her son because Berardi and Green spent so much time playing video games, and that she waited to come forward with what Berardi told her at the restaurant in order to protect Petitioner and Green. (RT 1445-46.)

Kimberly Arellanas, a defense investigator, testified that she interviewed Bart Cameron, who told her he was friends with Anna Tong and Nate Green, and knew Petitioner only in passing. (RT 1449-50.) Cameron said he was at Tong's apartment on the afternoon of July 8, 2005, with Petitioner, Tong, Green and Berardi; there was some discussion about a marijuana deal, after which Petitioner left about the same time Tong and Berardi left to go out to eat; Petitioner returned after a little while, and then left again and came right back. (RT 1450-53.) When Berardi and Tong returned and were told about the shooting by the police officers, Berardi looked genuinely stunned, Petitioner seemed distraught, and Tong said Marcus must have done something stupid. (RT 1453-56.) Cameron told Arellanas that Berardi seemed to take advantage of Petitioner, and that he dominated Petitioner and used him in their relationship. (RT 1462.) Arellanas also interviewed Tong, who said Petitioner seemed paranoid that Marcus Kegler or

one of his associates was going to do him some harm.  (RT 1457-58.)  Tong told Arellanas that her house had not been a party house until Petitioner and Berardi started staying there, that they were guests who would not leave, and that Berardi still considered Desiree his girlfriend at that time.  (RT 1462-63.)  Tong said it was unusual for Berardi to ask her out to eat, that Berardi told her he had been stalking Marcus, and while at the 7-Eleven Berardi received a call from Marcus during which Berardi told Marcus he would be met in the cul-de-sac with a quarter pound of marijuana.  (RT 1464.)  Tong said Berardi told her he needed the 7-Eleven receipt for an alibi, and that Petitioner called Berardi and told him: "The pizza has been delivered."  (RT 1465.)  Tong said that later that evening while in her apartment Petitioner admitted he shot someone at close range and the man "fell like a deck of cards."  (RT 1466.)

Ahmed Omar testified that he lived with Petitioner and Berardi for about a year when they lived in Rolando, that he met Anna Tong and Nate Green through them, and they often all hung out together at Tong's apartment.  (RT 1482-84.)  Omar said Tong was upset with Berardi because he was spending so much time with Green and introducing Green to other women, and that Tong admitted she would say or do anything to get Berardi in trouble to keep him away from Green, including sending him to jail, even if she had to lie.  (RT 1485-86, 1501.)

Matthew Ahmu testified that he worked at the Round Table Pizza restaurant on July 8, 2005, and had been friends with Berardi since they were in high school, six or seven years before. (RT 1504.)  Berardi came to the restaurant with Tong that afternoon and took his usual seat; neither of them looked upset or anxious, and Tong smiled as she left.  (RT 1504-11.)  Berardi paid for his meal at the Round Table Pizza restaurant at 6:24 p.m.  (RT 1542.)

Detective Dolan was recalled and testified that Anna Tong was not forthcoming with the police about what Berardi told her at the restaurant about her being his alibi.  (RT 1564.)  Dannie Bihum, a San Diego police officer, testified that he interviewed Tong at 8:02 p.m. on the night of the shooting, and said her demeanor was calm, and she did not say anything about Petitioner being involved in a shooting.  (RT 1572-73, 1580.)  The defense rested.  (RT 1581.)

The prosecution called San Diego police officer David Johnson, the supervisor of the homicide investigation team, who testified that he was contacted by Nate Green's father, Steven

Green.  (RT 1583-86.)  Steven told Johnson that Nate and Tong had told him that they had not been truthful with the police and were upset they were living a lie.  (RT 1586.)  Tong told Johnson that when she and Berardi were at the restaurant, Berardi told her that Marcus was bugging him to buy marijuana, and that Marcus had threatened his life.  (RT 1617.)

All parties rested, and the jury viewed the crime scene.  (RT 1626.)  During deliberations, the jury asked: "Can there be a conspiracy without first degree murder?  Can we consider conspiracy without first degree murder?"  (CT 680.)  The trial judge replied that: "All conspiracies to commit murder are necessarily premeditated and deliberated.  Thus, a defendant can only be found guilty of conspiracy to commit a first degree murder.  A defendant cannot be found guilty of a conspiracy to commit a second degree murder."  (CT 681.)  Petitioner alleges in Claim 2 here, as he did in state court, that a jury can find a conspiracy to commit first degree murder and still find that the subsequent killing was second degree murder, and the trial judge's answer therefore misled the jury by implying that if they found a conspiracy they were required to fix the degree of murder at first degree.  Petitioner also contends in Claim 2 that the judge should have sua sponte instructed the jury that it could not convict Petitioner of conspiracy based solely on Berardi's statements to Tong, but that there needed to be independent evidence of a conspiracy, and misinstructed the jury that they could consider Berardi's statements against Petitioner if they found a conspiracy to commit any crime, even a conspiracy to sell marijuana, rather than the charged conspiracy to commit murder.

On January 22, 2009, after approximately three full days of deliberations, the jury found Petitioner and Berardi guilty of conspiracy and first degree murder, found that Petitioner had personally used a handgun and personally caused great bodily injury and death, and found that Berardi was armed with a firearm during both offenses.  (RT 1928-30; CT 2156-72.)  Six days after the verdicts were returned, the trial judge received a letter from Juror No. 5, which, as summarized in Petitioner's new trial motion, stated:

> At the beginning of deliberations on January 22, 2009, the same day the verdict was finally reached after several days of deliberation, there were still three hold-outs for a murder conviction, and conspiracy had not even been discussed yet.  At some point there was only one hold-out for murder.  Then, one of the jurors, the only African-American juror, "launched into a heated racist tirade,

directed at all of us, accusing us of 'doing what you're gonna do' and saying 'you know god damn good and well if this was a white boy shot by a black man there wouldn't even be a trial.'  He had risen from his seat and was gesturing wildly." After he caught his breath he continued his accusations of racism.  He dared the other jurors to try to have him removed from the jury and stated that he did not want to be there.  After the tirade the remaining hold-out for murder was no longer a hold-out, and apparently conspiracy was quickly deliberated on and a unanimous decision reached.  Also, the juror who engaged in the racial tirade against all the other jurors spent most of his time in deliberations with his back turned to the rest of the jurors, "occasionally loudly snorting or scoffing, sometimes turning to us and making simplistic and defiant statements like 'he had a gun, they did a deal, a man got shot!' then turning his back on us again."  The final hold-out sobbed before raising her hand for a unanimous decision of guilt.  Juror #5 regrets that no one had the courage to call the bailiff regarding what was happening in the jury deliberation room.

(CT 1322.05.)

On February 20, 2009, the trial judge sent a letter to all 12 jurors which advised them the parties wished to speak to them about their deliberations and invited them to contact the court. (RT 1936.)  A hearing was held on April 3 and 10, 2009, at which six of the twelve seated jurors testified.  (RT 1960-2018.)  The defense moved for a new trial arguing, as Petitioner does in Claim 3 here, that the presence of the racially biased African-American Juror No. 9 (Petitioner and Berardi are both white) violated the defendants' federal Constitutional rights.  (CT 1311-20.) On May 21, 2009, the trial judge denied the new trial motion, finding that no misconduct had occurred and that the verdicts were not affected by the conduct or statements of Juror No. 9.  (RT 2022-25.)  On October 30, 2009, the trial court, for the same reasons, denied a second new trial motion based on the trial court's refusal to allow defense counsel to object during the hearing or cross-examine the jurors, and which also alleged (as Petitioner does in Claim 4 here) that the trial judge improperly inquired into the deliberative process of the jurors and improperly used evidence of the jurors' deliberative processes to determine the verdicts were not influenced by any potential misconduct.  (RT 2032-38.)

On November 30, 2009, Petitioner was sentenced to 50 years-to-life in state prison, consisting of 25 years-to-life for the first degree murder conviction and a consecutive term of 25 years-to-life (which he challenges in Claim 5 here) for the jury finding that he intentionally and personally discharged a handgun during the commission of the murder which proximately caused great bodily injury and death.  (CT 2191.)  The sentence for the jury finding that

Petitioner personally used a handgun during the murder, and the sentences on the conspiracy conviction and its related firearm use findings, were stayed.  (Id.)

## IV.

## PETITIONER'S CLAIMS

(1)  Petitioner's federal Constitutional rights were violated by the denial of his motion for acquittal because under the Toledo doctrine, the prosecution was bound by his statements which they introduced and which showed the killing was a justifiable homicide, as no substantial or credible evidence to the contrary was introduced by the prosecution other than Anna Tong's testimony, which was inconsistent and unreliable.  (Pet. at 6, 15-18.)

(2)  Petitioner's federal Constitutional rights were violated by the trial judge's misleading answer to the jury question, by the trial judge's failure to sua sponte instruct the jury that the statements by a codefendant were not sufficient by themselves to support a conspiracy conviction because the corpus delicti of conspiracy must be shown by independent evidence, and by the trial judge erroneously instructing the jury they were allowed to consider Berardi's statements against Petitioner if they found a conspiracy to commit any crime.  (Pet. at 7, 19-22.)

(3)  Petitioner's federal Constitutional rights were violated by Juror No. 9 serving on the jury because he was racially biased.  (Pet. at 8, 23-26.)

(4)  Petitioner's federal Constitutional rights were violated by erroneous admission and consideration of evidence of the jurors' deliberative processes in ruling that the verdicts were not affected by the statements or behavior of Juror No. 9.  (Pet. at 9, 27-30.)

(5)  Petitioner's federal Constitutional rights were violated by erroneous imposition of the firearm use sentence enhancement because it exceeded the maximum sentence allowed for his crime, violated double jeopardy principles, and was not a separate criminal act but amounted to protected Second Amendment activity.  (Pet. at 31-34.)

(6)  Petitioner's federal Constitutional rights were violated by ineffective assistance of counsel due to his appointed appellate counsel's failure to raise Claims 1, 4 and 5 presented here, and in failing to raise a claim of ineffective assistance of trial counsel.  (Pet. at 35-38.)

(7)  Petitioner is entitled to an evidentiary hearing in this Court in order to determine whether any error, or the cumulative effects of the errors, warrants habeas relief, in part because he did not receive an evidentiary hearing in state court.  (Pet. at 39-41.)

## V.

## DISCUSSION

For the following reasons the Court finds Claim 2 is procedurally defaulted but nonetheless fails under a de novo review, and the adjudication of the remaining claims by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court finds an evidentiary hearing is neither necessary nor warranted because Petitioner's claims can be denied on the basis of the state court record, and the California Attorney General is not a proper respondent.  The Court therefore **RECOMMENDS** Kamala Harris be dismissed as a respondent, Petitioner's request for an evidentiary hearing be **DENIED**, and the Petition be **DENIED**.

**A.    Standard of Review.**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court, that in order to obtain federal habeas relief, a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d) (West 2006). Even if the petitioner can satisfy § 2254(d), or show that it does not apply, he still must show a federal constitutional violation occurred.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from

[the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta," of United States Supreme Court decisions at the "time of the relevant state-court decision." Williams, 529 U.S. at 412. To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." Id. at 102-03.

## B. Claim 1

Petitioner contends in Claim 1 that his federal Constitutional right to due process was violated by the denial of his motion for acquittal after the prosecution rested its case-in-chief. (FAP at 15-18.) He argues here, as he did in state court, that the prosecution was bound by

Petitioner's statement that the killing was a justifiable homicide, because all of the prosecution's evidence, other than Anna Tong's testimony, was consistent with justifiable homicide, and Tong's testimony was inconsistent and unreliable.  (Id.)

Respondent answers that to the extent Petitioner is alleging only an error of state law, the claim is not cognizable on federal habeas.  (Ans. Mem. at 18-19.)  Respondent alternately contends that the appellate court's denial of the claim could not be contrary to or an unreasonable application of clearly established federal law because there is no United States Supreme Court authority applicable to such a claim.  (Id. at 19.)

"Before we can apply AEDPA's standards, we must identify the state court decision that is appropriate for our review.  When more than one state court has adjudicated a claim, we analyze the last reasoned decision." Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).

Petitioner presented Claim 1 to the state supreme, appellate and superior courts in sequential habeas petitions.  (Lodgment Nos. 16, 18, 20.)  The state supreme court summarily denied the petition without citation of authority or a statement of reasoning.  (Lodgment No. 21.)  The appellate court stated:

> May first contends the trial court erred in denying his motion for judgment of acquittal pursuant to Penal Code section 1118.1. May asserts that under *People v. Toledo* (1948) 85 Cal.App.2d 577, the prosecution should have been bound to his pre-trial statements that he shot the victim in self-defense.  The *Toledo* doctrine applies, however, only if there is no other "competent and substantial" evidence creating a conflict in the evidence.  (See, e.g., *People v. Burney* (2009) 47 Cal.4th 203, 248.)  As discussed in the opinion on direct appeal, May's trial was replete with evidence that conflicted with his claim of self defense.  The trial court properly permitted the jury to resolve the conflict in the evidence.

(Lodgment No. 19, In re May, No. D064374, order at 1.)

The superior court, after indicating the claim was subject to denial because it was not raised on direct appeal, stated:

> First, petitioner has not shown the trial court erred in denying his Penal Code section 1118.1 Motion for Judgment of Acquittal. Petitioner cites to *People v. Toledo* (1948) 85 Cal.App.2d 577 for the proposition that the prosecution is bound by a defendant's extrajudicial statements that are irreconcilable with guilt.

Petitioner then contends the prosecution's reliance on the testimony of witness Anna Tong was insufficient to discredit petitioner's account of the incident, which proved he did not have the requisite malice to support the murder charge. The *Toledo* doctrine obviates a defendant's burden of proving a defense when the prosecution's proof itself tends to show the defense, and there is no other competent and substantial evidence to the contrary. (*People v. Ross* (1979) 92 Cal.App.3d 391, 400.) When there is other "competent and substantial" evidence of guilt, the conflict in the evidence is, in the final analysis, one for the jury to resolve. (See *People v. Burney* (2009) 47 Cal.4th 203, 248; *In re George B.* (1991) 228 Cal.App.3d 1088, 1093.) Here, on January 6, 2009, after the prosecution rested, petitioner's Motion for Judgment of Acquittal was denied, but taken under submission as to the *Toledo* doctrine. On January 8, 2009, after the prosecution rested, the trial court denied petitioner's renewed Motion for Judgment of Acquittal. Petitioner has not shown there was no other competent and substantial evidence which could establish his guilt, such that the trial court erred in allowing the jury to consider all the evidence and determine whether the act amounted to unlawful homicide.

(Lodgment No. 17, In re May, No. HC21264, order at 3-4.)

Respondent is correct that to the extent Petitioner alleges merely an error of state law, which he did in the state appellate and superior courts, he is not entitled to federal habeas relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") However, in his federal Petition, Petitioner alleges that the denial of his Toledo motion amounted to a violation of his rights under the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution. (Pet. at 15.) He made the same argument in his state supreme court habeas petition. (Lodgment No. 20 at 5 [ECF No. 13-58 at 12].) In his state appellate and superior court habeas petitions, however, he omitted the reference to the federal Constitution, but cited the same California case interpreting the Toledo doctrine relied on by the appellate court. (Lodgment No. 18 at 8-18 [ECF No. 13-56 at 23-33]; Lodgment No. 16 at 8-18 [ECF No. 13-51 at 27-37], both citing Ross, 92 Cal.App.3d at 400 ("In the final analysis the question of defendant's guilt must be resolved from *all* the evidence considered by the jury.") (italics in original).) Because Petitioner is proceeding pro se here, as he did on state habeas, the Court must liberally construe his pleadings. Corjasso v. Ayers, 278 F.3d 874, 878 (9th Cir. 2002). The Court will liberally construe Petitioner's claim, both here and in the state supreme court, as alleging his federal Constitutional rights were violated because insufficient evidence was produced at his trial to convict him of conspiracy and murder, and will apply the provisions of

28 U.S.C. § 2254(d) to the silent denial by the state supreme court, the only state court to which Petitioner presented this claim as a federal claim.  Because there is no reasoned state court decision addressing the federal claim, the Court must consider the state supreme court's silent denial as a ruling on the merits, and "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Richter, 562 U.S. at 102.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).

Federal habeas courts must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law."  Id. at 324 n.16; see also Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.")  The Court must "apply the standards of Jackson with an additional layer of deference" when AEDPA applies, and can only grant relief if the state court's decision was objectively unreasonable.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  A federal habeas court must ask whether the relevant state court adjudication "reflected an unreasonable application of Jackson and Winship to the facts of this case."  Id. at 1275.

The state supreme court could have reasonably found sufficient evidence was presented by the prosecution as to Petitioner's guilt on conspiracy and first degree murder.  Petitioner admitted he shot the victim, and evidence was presented that his friend Berardi had an ongoing dispute with the victim over Desiree Winchell, and that Berardi had threatened to kill the victim on more than one occasion.  Anna Tong testified Berardi told her he took her to the restaurant, and was collecting receipts, in order to provide him with an alibi because Petitioner was going

to shoot the victim over: "Something to do with Desiree." (RT 844-48.) Tong said Berardi told her he had stalked the victim and knew his routine, and that they had to stay at the restaurant until the coast was clear. (RT 847, 850-51.) She also testified Petitioner called Berardi at the restaurant and said: "Something about the pizza has been delivered," and Green testified that he overhead Petitioner say something similar during a call shortly after coming back with the same quarter pound of marijuana he had left with a short time before. (RT 849, 1177-80.) The jury could have drawn a reasonable inference from that evidence that Petitioner and Berardi had agreed ahead of time to kill the victim when he met Petitioner for the drug deal, and that Petitioner called Berardi at the restaurant to inform him the victim had been shot and the need for an alibi was over. Although Petitioner contends his call to Berardi about a pizza having been delivered is consistent with his informing Berardi that the drug deal had been completed, it is inconsistent with Petitioner's statement that he did not deliver the marijuana, and with Green's testimony that Petitioner returned the marijuana unsold. That call is not consistent with Petitioner informing Berardi that their planned drug deal had gone so terribly wrong that Petitioner felt the need to shoot the victim in order to protect himself, as he told the police. The jury could have drawn a reasonable conclusion that the call was consistent with Petitioner informing Berardi that the object of their conspiracy, to murder the victim, had been completed, and it was safe for Berardi to end his alibi.

In addition, Nathan Green testified that the quarter pound of marijuana would sell for about $140, and evidence was presented that the victim had only $104.11 on his person. (RT 781-82, 789-91, 1171-75, 1204.) The victim's friend Rochella Wiggins testified that when she warned the victim not to make the deal because his girlfriend's ex-boyfriend was involved, the victim said the marijuana purchase was "a good deal." (RT 669.) The jury could draw a reasonable inference from that evidence that the victim was lured to the cul-de-sac by a quote of a price too low for him to resist. Finally, the jury could have drawn a reasonable inference that Petitioner's actions were inconsistent with justifiable homicide, as he shot an unarmed man execution-style, returned to pick up the marijuana while the bleeding victim lay dying in the street but did not summon medical help, hid in a closet when the police arrived, disposed of the

sweater he was wearing, appeared very well composed when he was dropped off at the bus station, and fled California after throwing the gun he used into San Diego Bay.

The evidence must be viewed "in the light most favorable to the prosecution," and seen in that light, it is clear the state supreme court could reasonably have determined that the prosecution had presented substantial and reliable evidence during its case-in-chief from which a jury could find that Petitioner conspired with Berardi to lure the victim to the cul-de-sac under the guise of a drug deal in order to murder him. Jackson, 443 U.S. at 319 (holding that a federal habeas court must respect the province of the jury to draw reasonable inferences from the evidence); see also Coleman v. Johnson, 566 U.S. ___, 132 S.Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality."); Richter, 562 U.S. at 102-03 (noting that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction), quoting Jackson, 443 U.S. at 332 n.5.

Considering the additional layer of deference a federal habeas court is required under AEDPA to give over and above the deference required by Jackson, this Court cannot say that the silent denial by the state supreme court involved an objectively unreasonable application of Jackson and Winship. Juan H., 408 F.3d at 1275; see also Richter, 562 U.S. at 102-03 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents.")  The state court adjudication is neither contrary to, nor involves an unreasonable application of, Jackson or Winship, and is not based on an unreasonable determination of the facts. Woodall, 134 S.Ct. at 1706-07; Richter, 562 U.S. 102-03; Bradshaw, 546 U.S. at 76; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Jackson, 443 U.S. at 324 n.16; Winship, 397 U.S. at 364; Juan H., 408 F.3d at 1275. The Court recommends habeas relief be denied as to Claim 1.

//

//

## C.    Claim 2

Petitioner alleges in Claim 2 that his federal Constitutional rights were violated when the trial judge: (1) misled the jury when answering its question; (2) failed to sua sponte instruct the jury that the statements of Petitioner and Berardi were not sufficient by themselves to prove a conspiracy because the corpus delicti of conspiracy must be shown by independent evidence; and (3) misinstructed the jury that they could consider Berardi's statements against Petitioner if they found evidence of conspiracy between Petitioner and Berardi to commit any crime, including a conspiracy to sell marijuana, rather than the charged conspiracy.  (Pet. at 19-20.)

Respondent answers that this claim is procedurally defaulted by virtue of the appellate court's determination that any error arising from the response to the jury's question was invited because the parties agreed to the response, and by the appellate court's finding that any claim of jury instructional error was waived by defense counsel's failure to object or propose a modified instruction.  (Ans. Mem. at 19-22.)  Respondent alternately contends the appellate court's denial of the claim (on the basis that the instructions and the trial judge's response to the jury's question were correct as a matter of law) is binding on a federal habeas court, and that because no clearly established federal law requires a state court to follow the corpus delicti rule, the denial of this claim cannot have been contrary to or involved an unreasonable application of clearly established federal law.  (Id. at 21-23.)

Petitioner concedes his counsel failed to object, but argues that the failure amounted to deficient performance.  (Traverse at 9.)  He also argues that the trial judge had an "obligation to perform his job in an appropriate manner" irrespective of the failure to object.  (Id.)

Claim 2 was presented to the state supreme court on direct appeal, and was summarily denied without analysis or citation of authority.  (Lodgment Nos. 14-15.)  It was also presented to the appellate court on direct appeal.  (Lodgment Nos. 8, 11.)  The Court will presume the state supreme court denied the claim for the same reasons as the appellate court, which issued the last reasoned opinion addressing the claim.  Ylst, 501 U.S. at 803-06.

/ /

/ /

**1. Response to the jury question**

Petitioner first alleges the trial judge misled the jury when answering their question. (Pet. at 19.) The appellate court denied the claim, stating:

> May and Berardi argue the court's response to a jury question was erroneous because it misdirected the jury that it could not convict May and Berardi on the conspiracy count if the jury concluded May was guilty only of second degree murder.

> *Background*

> During deliberations, the jury sent a note that asked:

> "1. Please clarify the definition of 2nd degree murder

> "2. Can there be a conspiracy without 1st degree murder? or can we consider conspiracy w/o 1st degree murder"

> The court met with counsel to frame the response. The court believed the second set of questions was of the greatest import, and was asking whether it was possible to conspire to commit second degree murder. The court stated its research, and specifically *People v. Cortez* (1998) 18 Cal.4th 1223, indicated a defendant could not conspire to commit second degree murder, because a conspiracy to commit murder necessarily constitutes premeditation and deliberation. Both defense counsel agreed with that proposition.

> The court then asked how the parties wished to respond to the questions. As to the first question, the court noted the easiest response would be to refer them back to the instructions, but asked "do we give them anything more?" As to the second question, the court asked how to word a response that conveyed a defendant cannot be convicted of conspiracy to commit second degree murder. Berardi's counsel initially suggested "simply . . . answer . . . both parts of question 2 . . . 'No.'" The court recognized that "of course, there can be conspiracy *without* first degree murder, but there can't be a conspiracy *to commit murder* in the second degree. You can only find a conspiracy to commit murder in the first degree, *because that's what's charged, a conspiracy to commit murder*." (Italics added.)

> May's counsel understood the jury's question to imply they were struggling with a logical inconsistency, and construed the question to be: "'If we can't find first degree murder on (the murder count), can we find conspiracy to commit murder?' (and)(m)y answer would be 'No, based on these facts.'" The court rejected May's counsel's proposal, characterizing it as a "(n)ice try," and instead proposed to (1) answer question 1 by referring the jury back to CALCRIM No. 521 and (2) answer question 2 by telling the jury "these defendants are charged in count 1 with conspiracy to commit murder. And then we have to find a way of telling them you can only conspire to commit a first degree murder. There's no conspiracy to commit second degree murder, because second degree murder has no premeditation and deliberation, which is, in essence, presumed by a conspiracy." All parties again agreed that statement accurately reflected the law applicable to the question posed. The court agreed to take a recess and generate an answer considering the parties' understanding of the law.

After a recess, the court proposed an answer to the questions as follows:

"For further explanation on the definition of second degree murder, please see instruction 521 which sets forth the distinction between first degree murder and second degree murder.

"All conspiracies to commit murder are necessarily premeditated and deliberated; thus, a defendant cannot be found guilty of a conspiracy to commit a second degree murder."

Berardi's counsel complained only that the first paragraph did not define second degree murder, and should instead have stated that "second degree murder is murder without deliberation, without premeditation and not justifiable." May's counsel agreed with Berardi's counsel, and also suggested the second paragraph should instead read "(A)ll conspiracies to commit murder are necessarily premeditated and deliberated; thus, a defendant can only be found guilty of a conspiracy to commit first degree murder." The court, characterizing May's proposal as the functional equivalent of the court's proposed answer (stating it was "six (of) one, half dozen (of) the other," decided to combine its version with May's reformulation and the response to the jury's question provided: "All conspiracies to commit murder are necessarily premeditated and deliberated. Thus, a defendant can only be found guilty of a conspiracy to commit a first degree murder. A defendant cannot be found guilty of a conspiracy to commit a second degree murder." No party objected to this proposal.

*Legal Framework*

"The trial court has a duty to help the jury understand the legal principles the jury is asked to apply. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) In particular, under section 1138 the court must attempt 'to clear up any instructional confusion expressed by the jury.' (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) But '(t)his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' (*Beardslee*, at p. 97; (citation).) In exercising that discretion, the trial court 'must at least consider how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given.' (*Beardslee*, at p. 97; (citation).)" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465.) Thus, when the instructions are full and complete, the court has discretion "to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Beardslee*, at p. 97.)

*Analysis*

May and Berardi argue the response to the question was prejudicially misleading because it implied that, if the jury found Berardi and May conspired to murder Kegler, the jury was required to fix the degree of the resulting murder as first degree murder. However, the parties below agreed, and do not contest on appeal, that the answer actually given by the court was a correct statement of law under *People v. Cortez, supra*, 18 Cal.4th 1223, i.e., that a defendant cannot be convicted of conspiring to commit second degree murder.

May and Berardi instead assert the response was incomplete because the jury was not instructed that, even if it found Berardi and May conspired to murder Kegler, it could nevertheless find the actual murder was second degree murder.

However, the court's response to the question provided an answer that all parties assisted in crafting, and that defense counsel understood was responsive to the question posed, [FN14] and therefore any claim that it was somehow incomplete must be deemed invited error.

> FN14:  On appeal, Berardi argues invited error should not apply because his counsel did object to the proposed instruction. However, his counsel's objection only stated that he understood the question to be that, if the jury could not find murder in the first degree, could the jury still convict the defendants of conspiracy, and he therefore proposed the court should answer the second set of questions with "No, based on these facts," which appears to be incorrect under *In re E.R.* (2010) 189 Cal.App.4th 466.  Defense counsel never objected that the response ultimately crafted to answer the question was misleading or incomplete by foreclosing the jury from finding second degree murder if they found a conspiracy. To the contrary, May's counsel specifically stated his understanding was that the question was "about conspiracy to commit first degree murder and maybe first degree murder. (My) concern is that the answer sets forth a portion *which they may or may not be thinking about, that's second degree murder. (¶) I don't think this is one of those questions where they are actually saying, 'Can we convict them of second degree murder?' I think it's a question of whether or not there can be a conspiracy without first degree murder.*" (Italics added.)

A party whose counsel agrees at trial with the court's proposed response to a jury inquiry cannot later challenge the response on appeal as being too limited.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193; *People v. Medina* (1990) 51 Cal.3d 870, 902 ("we note that defense counsel's approval of the court's limited response to the jury's inquiry should bar defendant from contending on appeal that a more elaborate response should have been made. If defendant desired such a response, he should have proposed it").)  Moreover, a defendant who does not raise the issue to the trial court "may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 113.)  We conclude the statement of law provided by the court was correct and was responsive to the question as understood by the parties, and that any alleged incompleteness or misleading implication in the answer provided was invited error.

(Lodgment No. 12, <u>People v. Berardi, et al.</u>, No. D056544, slip op. at 23-28.)

Respondent first argues that this aspect of Claim 2 is procedurally defaulted by virtue of the appellate court's finding that any error was invited. (Ans. Mem. at 21.)  In order to preclude federal review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to bar federal review.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 (1991). To be "independent" the state bar must not be interwoven with federal law.  <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983).  To be "adequate," the

state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default."  Calderon v. Bean, 96 F.3d 1126, 1129 (9th Cir. 1996).

"[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989) (internal quotation marks omitted).  A procedural default does not arise where a state court erroneously applies a state procedural rule.  Sivak v. Hardison, 658 F.3d 898, 907 (9th Cir. 2011); see also Lee v. Kemna, 534 U.S. 362, 375 (2002) (holding there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.")

Respondent has the initial burden of pleading as an affirmative defense that Petitioner's failure to satisfy a state procedural rule forecloses federal habeas review.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).  The burden then shifts to Petitioner to challenge the independence or adequacy of the procedural bar.  Id.  If Petitioner makes a sufficient showing, then the ultimate burden of proof falls on Respondent.  Id.

Respondent has carried the initial burden by identifying California's contemporaneous objection rule as precluding federal review of this claim.  See Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999) (holding that California's contemporaneous objection rule supports a procedural default in a federal habeas proceeding).  Petitioner concedes that his trial counsel failed to object, but argues that by doing so counsel rendered constitutionally ineffective assistance.  (Traverse at 9.)

Because Petitioner has not challenged the independence or adequacy of the state rule, the Court finds this aspect of Claim 2 to be procedurally defaulted.  Bennett, 322 F.3d at 586.  The Court may reach the merits of the claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim. Coleman, 501 U.S. at 750.

/ /

### a) Cause

The cause prong can be satisfied if Petitioner shows an "objective factor" that precluded him from raising his claim in state court, such as interference by state officials or constitutionally ineffective counsel. <u>McCleskey v. Zant</u>, 499 U.S. 467, 493-94 (1991). Petitioner contends his trial counsel's failure to object to the trial judge's answer to the jury question amounted to ineffective assistance. (Pet. at 35-36.) As discussed immediately below in the prejudice section, Petitioner is unable to establish that any potential objection would have been sustained. Also, as discussed below in Claim 6, Petitioner has failed to show that he received ineffective assistance of counsel. Thus, he is unable to rely on actions by his counsel to establish cause. <u>See Edwards v. Carpenter</u>, 529 U.S. 446, 451-52 (2000) ("Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice. Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.") (citation omitted). The Court finds that Petitioner has not shown cause to excuse the default. <u>McCleskey</u>, 499 U.S. at 493-94; <u>Edwards</u>, 529 U.S. at 451-52; <u>Keeney</u>, 882 F.2d at 1434.

### b) Prejudice

"Prejudice [to excuse a procedural default] is actual harm resulting from the alleged error." <u>Vickers v. Stewart</u>, 144 F.3d 613, 617 (9th Cir. 1998). Petitioner cannot demonstrate prejudice arising from the failure of this Court to reach the merits of this claim sufficient to excuse the default because, for the following reasons, he cannot demonstrate that the trial judge's answer to the jury question amounted to federal Constitutional error.

In order to show a federal due process violation arising from instructional error, Petitioner must demonstrate that the instruction "so infected the entire trial that the resulting conviction violates due process." <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). In addition, "[i]t is well established that the instruction 'may not be judged in

artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.

Petitioner's contention that the jury may have meant something by its question other than what the trial judge understood is speculative, and is undermined by the appellate court's finding that the parties agreed with the answer given by the trial judge.  The findings by the appellate court that the answer was legally correct and responsive to the question, and that the instructions were legally correct, are entitled to deference in this Court.  See McGuire, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")  This Court must defer to the state court's construction unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).  Nevertheless, even if the answer given was a correct statement of California law, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."  Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.")

There is no indication of fundamental unfairness by the trial court's failure to interpret the jury's question as an indication that they would have found Petitioner guilty of second degree murder but for their finding that he conspired with Berardi to commit murder.  Petitioner argued on appeal that the jury may have found that Berardi arranged for Petitioner and Marcus to be together under circumstances from which Berardi envisioned a potential killing might result, but that Petitioner may have been unaware of that aspect of the plan.  (Lodgment No. 8 at 26 [ECF No. 13-43 at 34].)  Petitioner argued that the jury may have found that he, unaware of Berardi's agenda, killed the victim in the manner he described to the police, consistent with justifiable homicide, but that the jury found a conspiracy in order to hold Berardi responsible as well, and felt compelled to find Petitioner guilty of first degree murder due to the misleading answer.  (Id.)

Although Petitioner is correct that evidence was presented that he and Berardi felt threatened by the victim, and that Petitioner said he shot the victim while in a state of concern for his own safety, as set forth above, the evidence strongly suggested that Berardi and Petitioner had agreed before the drug deal took place that Petitioner was going to shoot the victim rather than sell him marijuana. There was evidence Berardi was jealous of the victim's relationship with Desiree, and that Berardi had previously threatened to kill the victim. At about the same time the victim was shot, Berardi told Tong that Petitioner was going to shoot the victim over something to do with Desiree. Petitioner's statement to Berardi immediately after the shooting that "the pizza had been delivered" is consistent with a confirmation that the victim had been shot as planned, and inconsistent with Petitioner having been surprised by a drug deal gone wrong.

There is no indication the jury misunderstood the answer as instructing them if they found a conspiracy to commit murder they were required to fix the degree of the murder at first degree. Rather, they were told if they did not find Petitioner had premeditated and deliberated the killing, they could not find Petitioner and Berardi had conspired to commit murder, because conspiracy to commit murder necessarily required a finding of deliberation and premeditation. In addition, the jury asked the question within a few hours of beginning their deliberations, and they deliberated more than sixteen additional hours over several days after they received the answer before they reached a verdict. (CT 2156-68.) Thus, there is no indication they were struggling with the issue as suggested by Petitioner. In any case, defense counsel raised this concern with the trial judge, who rejected it, and Petitioner has not shown that had his trial counsel objected to the answer as given, or suggested a different answer, the objection would have been sustained or a different answer provided. Neither has he shown that the state court's finding that the answer was correct and responsive is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Oxborrow, 877 F.2d at 1399. Thus, Petitioner has not shown "actual harm resulting from the alleged error" sufficient to excuse the default. Vickers, 144 F.3d at 617.

//

//

-34-

### c) Fundamental miscarriage of justice

Petitioner can still avoid the procedural default if he can demonstrate that a fundamental miscarriage of justice would result from this Court's failure to reach the merits of the claim. The "miscarriage of justice" exception is limited to petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995). "In order to pass through Schlup's gateway, and have an otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting Schlup, 513 U.S. at 327.

"A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that 'a court cannot have confidence in the outcome of the trial.'" Majoy, 296 F.3d at 776, quoting Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1987) (en banc), quoting Schlup, 513 U.S. at 316. For the reasons set forth in the prejudice section, Petitioner has not shown that, but for the allegedly erroneous answer to the jury's question, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of first degree murder or conspiracy to commit murder, or that this Court cannot have confidence in the outcome of the trial. Majoy, 296 F.3d at 776; Schlup, 513 U.S. at 314-15.

### d) Conclusion

The Court finds habeas relief is not available as to the first aspect of Claim 2 because it is procedurally defaulted and Petitioner has failed to demonstrate cause, prejudice or a fundamental miscarriage of justice sufficient to excuse the default. Alternately, the Court finds, for the reasons set forth in the prejudice section above, that habeas relief is unavailable because, under a de novo review of the claim, Petitioner has not demonstrated a violation of his federal Constitutional rights arising from the trial judge's answer to the jury's question. See Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (holding that when a federal habeas court addresses a claim which has not been adjudicated on the merits in state court, pre-AEDPA de

novo review is required.); see also Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (holding that under a de novo review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution.")

### 2. Failure to sua sponte instruct on corpus delicti

Petitioner next contends the trial judge failed to sua sponte instruct the jury they could not consider statements by Petitioner and Berardi of proof of conspiracy to commit murder unless the corpus delicti of that charged conspiracy was independently proven.  (Pet. at 19-20.) Respondent answers that the claim is procedurally defaulted as a result of defense counsel's failure to request the instruction, and that in any case there is no clearly established federal law requiring a state court to follow the corpus delicti rule.  (Ans. Mem. at 22-23.)

The state appellate court denied the claim, stating:

> May and Berardi argue the trial court was sua sponte obligated to modify CALCRIM No. 359 to instruct that the jury could not consider Berardi's (or May's) extrajudicial statements as proof of the conspiracy charge unless the corpus delicti of the charge was shown by independent evidence.  May and Berardi assert the failure to give this pinpoint instruction was prejudicial error, arguing the independent evidence did not provide any evidence from which the jury could have inferred the existence of a conspiracy to murder Kegler, and therefore it is likely the jury would have acquitted May and Berardi of the conspiracy count because the jury would have understood that the only evidence supporting that charge (Berardi's extrajudicial statements to Tong) could not have provided proof for the conspiracy count.

> *Background*

> The court gave CALCRIM No. 359, without modification, which instructed the jury that:

> "The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime or a lesser included offense was committed. (¶)  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. (¶)  The identity of the person who committed the crime and the degree of the crime may be proved by the defendant's statements alone. (¶)  You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

Neither defendant objected to the instruction or proffered any proposed modification to CALCRIM No. 359.

*Legal Framework*

CALCRIM No. 359 correctly expresses the corpus delicti rule. (*People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.) "'"The corpus delicti of a crime consists of two elements(:) the fact of the injury or loss or harm, and the existence of a criminal agency as its cause."'" (*People v. Zapien* (1993) 4 Cal.4th 929, 985–986.) "(T)he corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant." (*People v. Wright* (1990) 52 Cal.3d 367, 403, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) In other words, the corpus delicti rule requires "every *conviction* must be supported by some proof of the corpus delicti *aside from* or *in addition to* (the defendant's extrajudicial) statements, and that the jury must be so instructed." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1165.) The purpose of the corpus delicti rule is to assure that an accused does not admit to a crime that never occurred. (*People v. Jennings* (1991) 53 Cal.3d 334, 368.) The corpus delicti rule is satisfied by a "slight" or "minimal" quantum of proof. (*Id*. at pp. 364, 367.)

A court has the sua sponte obligation to instruct on the corpus delicti rule whenever an extrajudicial statement by the accused forms part of the prosecution's evidence (*People v. Alvarez, supra*, 27 Cal.4th at pp. 1165, 1170), and instructions given must be given correctly. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) However, when a court's instruction is a correct statement of the applicable law and is responsive to the evidence, a defendant may not complain on appeal that the instruction was too general or was incomplete unless the party proffered a proposed modification that clarified or amplified the allegedly incomplete instruction. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 364–365.)

*Analysis*

CALCRIM No. 359 is a correct statement of the corpus delicti rule (*People v. Reyes, supra*, 151 Cal.App.4th at p. 1498), and May and Berardi do not contend otherwise. May and Berardi instead argue the court was sua sponte obligated to modify CALCRIM No. 359 to instruct that the jury could not consider Berardi's extrajudicial statements to Tong as proof of the conspiracy charge until it was satisfied that independent evidence establishing the corpus delicti of the conspiracy charge was shown. However, May and Berardi did not proffer this pinpoint instruction, and therefore any claim of error is waived.

May and Berardi assert we may reach the issue, notwithstanding the waiver rule, by arguing that the sua sponte instructional obligation encompasses the obligation to instruct correctly, and the unmodified version of CALCRIM No. 359 was incorrect on the facts of this case. It appears May and Berardi's argument is premised on the claim that, because there was no independent evidence establishing the corpus delicti of conspiracy, the unmodified instruction was erroneous because it "allowed the jury to rely on Berardi's admissions to Tong to convict (May) of conspiracy without independent proof of the corpus delicti of (conspiracy to commit murder)." May and Berardi then examine each piece of the independent evidence, proffering an alternative inference for why May acted or spoke in the fashion demonstrated, consistent with criminal conduct but not necessarily with a conspiracy to murder Kegler, to explain why there was no evidence (apart from Berardi's statements to Tong) from which the jury could have inferred the existence of a conspiracy to murder Kegler. [FN15]

FN15:  For example, May argues the fact he took a gun with him to the meeting with Kegler, from which the jury could infer he intended to use it to fulfill the agreed object of the conspiracy, was equally explicable as reflecting a drug dealer's typical accoutrements when engaging in drug transactions.  May also argues his statement that "the pizza is delivered," from which the jury could infer he was informing Berardi the agreed object of the conspiracy had been accomplished, was equally explicable as referring to the drug transaction.  May proffers similar alternative inferences for much of the independent evidence.

However, a closely analogous argument was rejected in *People v. Culton* (1992) 11 Cal.App.4th 363, when the court explained:

"Defendant contends that the trial court erred in finding the People did carry their burden of making a prima facie showing of the corpus delicti of each of the charged offenses and then admitting his inculpatory statements.  We disagree.  [¶]  The California law regarding the corpus delicti rule as to its elements, the necessary proof thereof and the burden of proving such, was recently stated in *People v. Wright* [, *supra*,] 52 Cal.3d 367, 403–404 . . . as follows: 'In any criminal prosecution, the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant.  (Citations.)  The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm.  (Citation.)   "The independent proof may be by circumstantial evidence (citation), and it need not be beyond a reasonable doubt.  A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient.  (Citations.)" (Citation.) . . .) (¶)  The People's burden is met by evidence which creates a reasonable inference that the harm could have been caused by a criminal agency, even in the presence of an equally plausible noncriminal explanation of the incident.  Circumstantial evidence and inferences that may reasonably be drawn therefrom are adequate." (*People v. Culton, supra*, at pp. 366–367.)

Because the unmodified version of CALCRIM No. 359 correctly stated the law, and was not made erroneous by the evidence produced at trial, May and Berardi have waived any claim of error to the instructions on corpus delicti.

(Lodgment No. 12, <u>People v. Berardi, et al.</u>, No. D056544, slip op. at 28-32.)

Respondent contends this aspect of Claim 2 is procedurally defaulted due to defense counsel's failure to contemporaneously object to the instruction. (Ans. Mem. at 20.) Petitioner responds that the failure to object was due to ineffective assistance of counsel.  (Traverse at 9.) The Court finds, for the same reasons set forth above, that this claim is procedurally defaulted. The Court also finds that Petitioner has not shown cause for the default because, as discussed in Claim 6 below, he has failed to show he received ineffective assistance of counsel.

In order to demonstrate prejudice to excuse the default, Petitioner must show "actual harm resulting from the alleged error" in failing to sua sponte instruct the jury that they could not consider Berardi's statements to Tong as proof of a conspiracy unless they were satisfied that independent evidence established the corpus delicti of the conspiracy. Vickers, 144 F.3d at 617. Petitioner must demonstrate that the instruction should have been given, and that its omission "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Where the failure to give an instruction is in issue, the burden on Petitioner is "especially heavy." Id.

Petitioner has not carried his heavy burden of showing the jury should have been instructed that the corpus delicti of conspiracy was required to be established by evidence independent of his or Berardi's statements. The jury was in fact instructed that they could not consider any statement by Berardi and Petitioner unless the prosecution had proven by a preponderance of the evidence that: "Some evidence other than the statement itself established that a conspiracy to commit a crime existed when that statement was made." (RT 1752.) In addition, sufficient evidence of conspiracy to murder the victim was presented at trial independent of the statements of Berardi and Petitioner. The victim's friend, Wiggins, testified that she warned the victim not to involve himself in a drug deal with Berardi but he did so because it was such a good deal, and the victim had less money on his person than what Green testified he charged for the marijuana. Green testified that he supplied the marijuana to be sold to the victim, and that Green gave the marijuana to Petitioner but he returned it soon afterwards. Telephone records showed that calls were exchanged between Berardi and the victim leading up to the drug deal, and video evidence showed a person fled the area where the victim was found, and returned shortly thereafter. There was also evidence that Berardi disliked the victim because he saw him as a rival for the affections of a woman whom they both wished to marry, as well as evidence they had argued over that rivalry. Evidence was also presented that Petitioner did not act as if he had committed a justifiable homicide, in that he returned to pick up the marijuana without summoning paramedics at a time when the victim was lying in the road bleeding, hid in Tong's closet when the police came to the house, and was well composed as he

fled the state after disposing of the sweater he wore during the shooting.  All of that evidence was independent of the statements made by Berardi and Petitioner, and was sufficient to permit the jury to find Petitioner and Berardi had conspired to lure the victim to the cul-de-sac to be murdered under the guise of a drug deal too good to resist.

Because sufficient evidence existed to show the corpus delicti of conspiracy to commit murder independent of the statements by Petitioner and Berardi, Petitioner has not shown a federal Constitutional violation by the failure of the trial judge to sua sponte instruct the jury with a pinpoint instruction that the corpus delicti must be independently established by evidence other than his or Berardi's statements.  Petitioner has failed to demonstrate that the instruction should have been given, or that the omission infected his trial with constitutional error, and has therefore failed to show "actual harm resulting from the alleged error" sufficient to excuse the default.  Vickers, 144 F.3d at 617.  He has also failed to show a fundamental miscarriage of justice because he has not shown it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt had they been so instructed, or that the Court cannot have confidence in the outcome of the trial.  Majoy, 296 F.3d at 776; Schlup, 513 U.S. at 314-15.

The Court finds the second aspect of Claim 2 is procedurally defaulted, and that Petitioner has failed to show cause and prejudice, or a fundamental miscarriage of justice, to excuse the default.  The Court alternately finds that, to the extent the Court could reach the merits of the claim, habeas relief is unavailable because, under a de novo review, Petitioner has failed to show a federal Constitutional violation for the same reasons he has not shown prejudice to excuse the default.  Pirtle, 313 F.3d at 1167-68; Hayes, 399 F.3d at 978.

**3.  Erroneous instruction**

Petitioner alleges the jury was erroneously instructed they could consider Berardi's statements to Tong if they found evidence of a conspiracy to commit any crime, rather than the charged conspiracy.  (Pet. at 19-20.)  Respondent contends the claim is procedurally defaulted by virtue of defense counsel's failure to object to the instruction as given, but does not address the merits of the claim.  (Ans. Mem. at 22.)  The state appellate court stated:

> May asserts the unmodified version of CALCRIM No. 418 was prejudicially misleading because it permitted the jury to consider Berardi's

statements to Tong as against May if the jury found a conspiracy to commit any crime existed between May and Berardi. May argues that, because there was evidence supporting a conspiracy to sell marijuana to Kegler, the court was sua sponte obligated to modify CALCRIM No. 418 to ensure the jury only considered Berardi's statements to Tong as against May if it found a conspiracy to commit murder existed between Berardi and May.

*Background*

The court gave CALCRIM No. 418, which, as adapted, instructed the jury:

"In deciding whether the People have proved that the defendants committed the crimes charged, you may not consider any statement made out of court by (Berardi) or (May) to Anna Tong unless the People have proved by a preponderance of the evidence that: (¶) 1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; (¶) 2. (May or Berardi) were members of and participating in the conspiracy when they made the statement; (¶) 3. (May or Berardi) made the statement in order to further the goal of the conspiracy; (¶) AND (¶) 4. The statement was made before or during the time that the defendants were participating in the conspiracy. (¶) A statement means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression. (¶) Proof by a preponderance of the evidence is a different standard of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. (¶) You may not consider statements made by a person who was not a member of the conspiracy even if
the statements helped accomplish the goal of the conspiracy. (¶) You may not consider statements made after the goal of the conspiracy had been accomplished."

*Legal Framework*

For the statements of an alleged coconspirator to be admissible as against the nonspeaking defendant, the prosecution need only produce prima facie evidence of the existence of the conspiracy and that the statements were made by a participant and in furtherance thereof. (*People v. Herrera* (2000) 83 Cal.App. 4th 46, 58–64.) If the jury concludes the foundational elements are shown by a preponderance of the evidence, the statements of an alleged coconspirator are admissible as against the nonspeaking defendant. (*Id*. pp. 63–64.)

*Analysis*

May does not contend that the instruction given by the court incorrectly articulated the general principles the jury was required to apply to determine whether Berardi's statements to Tong were admissible as against May. Instead, he argues the court was sua sponte obligated to amend the instruction to state that the jury was required to determine whether there was some evidence (other than the statement itself) establishing there was a conspiracy to commit murder (rather than a conspiracy to sell marijuana) when the statement was made. However, while Berardi and May argued at trial the instruction as a whole should be omitted, [FN16] neither proffered any proposed modification to the instruction specifying the refinements to the instruction that May now contends were

required.   As previously discussed, when a court's instruction is a correct statement of the applicable law and is responsive to the evidence, a defendant may not complain on appeal that the instruction was too general or was incomplete unless the party proffered a proposed modification that clarified or amplified the allegedly incomplete instruction.   [FN17]   (*People v. Tuggles, supra*, 179 Cal.App.4th at pp. 364–365.)  We therefore conclude May's appellate argument was not preserved.

> FN16:  The objections raised below by May and Berardi were that, to the extent the instruction required the jury to consider whether a preponderance of the evidence established the existence of the conspiracy as a predicate to considering the statements to Tong, that instruction would prejudice the defendants because "you are asking the jurors to assess by (a) preponderance of the evidence the same facts, same evidence they are going to assess supposedly later beyond a reasonable doubt, the existence of a conspiracy. My problem with that is once they have made up their mind, predetermined, 'Look, by (a) preponderance of the evidence, we think that a conspiracy existed and therefore we used these statements('), . . . it's going to be easier for them not to apply the beyond a reasonable doubt standard (to the same issue on the charged crime)."

> FN17:  Although May contends the instruction was misleading on the facts of this case because it implied Berardi's statement in furtherance of a conspiracy to commit a different crime would not be admissible as against May, there is no authority cited for this proposition, and we are aware of none.

(Lodgment No. 12, <u>People v. Berardi, et al.</u>, No. D056544, slip op. at 32-34.)

Respondent again argues the claim is procedurally defaulted by virtue of the failure to object or propose an alternate instruction at trial.  (Ans. Mem. at 22.)  Petitioner again relies on allegations of ineffective assistance of trial counsel.  (Traverse at 9.)  For the reasons set forth above, the Court finds this aspect of Claim 2 to be procedurally defaulted.  The Court also finds Petitioner has not shown cause to excuse the default because, as discussed below in Claim 6, he has not demonstrated he received constitutionally ineffective assistance of counsel with respect to his trial counsel's failure to object.

The Court also finds Petitioner has not shown prejudice, or a fundamental miscarriage of justice, to excuse the default, because, for the following reasons, he has not identified a federal Constitutional violation arising from the alleged instructional error.  Petitioner must carry an "especially heavy" burden of showing that the proposed modification to the instruction should

1  have been given, and that its omission "so infected the entire trial that the resulting conviction

2  violates due process." Kibbe, 431 U.S. at 154-55.

3  As quoted above, the state court found the instruction as given was a correct statement

4  of the applicable law and was responsive to the evidence.  This Court must defer to the state

5  court's construction because it has not been shown to be "untenable or amounts to a subterfuge

6  to avoid federal review of a constitutional violation." Oxborrow, 877 F.2d at 1399.  There is no

7  indication of fundamental unfairness arising from the failure to modify the instruction to tell the

8  jury they could only use Berardi's statement to Tong against Petitioner if the jury found

9  independent evidence of a conspiracy to murder the victim (rather than conspiracy to commit

10  any crime, such as conspiracy to sell marijuana), because, as set forth above, there was sufficient

11  independent evidence to prove a conspiracy to commit murder.  Jammal, 926 F.2d at 919-20.

12  In fact the evidence was more consistent with a conspiracy to murder the victim than with a

13  conspiracy to sell him marijuana, in that the evidence showed the victim was lured to the cul-de-

14  sac to buy marijuana below market price by someone who did not like him and who had

15  previously threatened to kill him.  Petitioner's call to Berardi after the shooting, which was

16  overheard not only by Tong but by Green, during which Petitioner said something about a pizza

17  having been delivered, was not consistent with Petitioner letting Berardi know that the marijuana

18  sale had been completed because the sale had not been completed, as the evidence showed that

19  Petitioner went back, retrieved the marijuana, and returned it to Green.  That call was also not

20  consistent with a drug deal gone terribly wrong, but is consistent with Petitioner informing

21  Berardi that the object of their conspiracy, to kill a man whom Berardi had previously threatened

22  to kill, had been completed, and that the coast was clear for Berardi to end his alibi.

23  The Court finds the third aspect of Claim 2 is procedurally defaulted, and Petitioner has

24  failed to show cause and prejudice, or a fundamental miscarriage of justice, sufficient to excuse

25  the default.  The Court alternately finds that, to the extent the Court could reach the merits of the

26  claim, habeas relief is unavailable because, under a de novo review, Petitioner has failed to show

27  a federal Constitutional violation for the same reasons he has not shown prejudice to excuse the

28  default.  Pirtle, 313 F.3d at 1167-68; Hayes, 399 F.3d at 978.

1    The Court recommends habeas relief be denied as to Claim 2.

2    **D.    Claim 3**

3    Petitioner alleges in Claim 3 that his federal Constitutional rights were violated by the

4    presence of Juror No. 9 on his jury because he was racially biased.   (Pet. at 8, 23-26.)

5    Respondent answers that the state court finding that there was no evidence of juror bias is

6    objectively reasonable within the meaning of § 2254(d).   (Ans. Mem. at 23-24.)   Petitioner

7    replies that he has established "juror bias by showing the juror in question stated a belief in

8    varying degrees for people depending on race."  (Traverse at 9.)

9    The trial judge held a hearing during which Juror Nos. 1, 2, 3, 5, 11, and 12 were asked

10   questions from a modified list submitted by the attorneys (CT 699-700, 1310.06-.08, 2057-62),

11   including whether any juror had refused to deliberate or attempted to intimidate other jurors;

12   whether any juror ever felt pressured, intimidated or had their ability to deliberate affected;

13   whether the race of the victim was ever brought up during deliberations; and how quickly they

14   reached a verdict after Juror No. 9's outburst and if it persuaded or influenced the hold-out

15   jurors.  (RT 1960-2018.)  The testimony of the jurors was summarized by the appellate court as

16   follows:

17   *Juror No. 1*:

18   Juror No. 1 stated all jurors participated in the deliberations "to some
     extent," and that Juror No. 9 was a more active participant at the beginning of the
19   deliberations.  Juror No. 1 said that Juror No. 9 was not inattentive, but did not
     watch the security system tapes when the rest of the jury chose to watch them
20   because he felt he already "knew everything he needed to know." Juror No. 1 was
     one of the two or three jurors who voted to convict after viewing the security
21   system tapes, which was the verdict that Juror No. 9 "thought we should have
     reached from the beginning."
22
     Juror No. 9 did appear hostile, and turned his back toward other jurors.
23   Juror No. 9 expressed the opinion the rest of the jurors were "taking too long" in
     their deliberations, and stated (either just after or just prior to the conclusion of
24   jury deliberations) that "if it had been a white boy on the ground and a black boy
     who had done the shooting . . . it wouldn't have taken us five minutes to reach the
25   verdict." When Juror No. 1 responded angrily by saying, "How dare you consider
     me a racist," Juror No. 9 repeatedly said "If the shoe fits, wear it." Juror No. 1
26   indicated Juror No. 9's outburst seemed "farfetched" because none of the jurors
     made any overt mention of the race of the victim or the defendants while
27   deliberating.

28

*Juror No. 3*:

Juror No. 3 stated all jurors participated in the deliberations, and no juror refused to review or consider any evidence. Juror No. 3 described an outburst, which he believed occurred the day before the jury reached its common verdict, and said "there was a race card played which turned some of the jurors off," because Juror No. 9 said "if there was a white man shot by a black man . . . this would all be over very early." The outburst angered a lot of the jurors, but "(i)t died down."

*Juror No. 5*:

Juror No. 5 described Juror No. 9 as disrespectful, because Juror No. 9 spent some of the time with his back towards the other jurors and at times scoffed or made "noises," like he had made up his mind and anyone who disagreed with him would incite Juror No. 9 to say things like "You just don't get it" or "You don't understand." Although Juror No. 9 acted "aloof . . . with his back turned to us, he was participating . . . and he did contribute some in the arguing." There were three jurors who believed the defendants were not guilty or not guilty as charged, but two of them had changed their minds and one was "still half and half" before Juror No. 9's outburst, but the jury became unanimous after the outburst. Juror No. 3 stated "we were 99–percent done and I thought that we were doing good (and) when that tirade started, it was astonishing. It was so out of place. It was not needed." The unanimous verdict was reached within 10 or 15 minutes after the outburst.

By the time of the outburst, the arguments of the jurors in favor of acquittal had been "thinning," and several other jurors scolded Juror No. 9 for his outburst. Juror No. 5 stated the outburst did not change the verdict but may have "sped us along" in the direction the jury was already heading.

*Juror No. 11*:

Juror No. 11 stated all jurors participated in the deliberations, and no juror refused to review or consider any evidence, although it "might have appeared at times" that Juror No. 9 was inattentive because he had his back to the jury looking at a picture on the wall. The only time the race of the victim or the defendants was discussed was after the verdicts had been reached, and Juror No. 11 also believed it may have occurred after the verdicts had been signed, when Juror No. 9 said words to the effect of "(i)f this had been a white man, we would have done this a long time ago," which elicited groans and one stern response. Juror No. 11, who described the deliberations as "an ordeal," said there were arguments between jurors over the facts that "would get a little testy" (some of which involved Juror No. 9 and others in which Juror No. 9 was not involved), but these did not seem to have intimidated or placed undue pressure on any juror.

*Juror No. 12*:

Juror No. 12 stated all jurors participated in the deliberations and no juror was inattentive or refused to review or consider any evidence. Juror No. 12 stated that Juror No. 9 at times exhibited nonverbal and verbal behavior that Juror No. 12 interpreted as expressing a belief by Juror No. 9 that the other jurors were naïve or lacked the experience that Juror No. 9 had with crime, including rolling his eyes or saying, "In my neighborhood, we know what a gunshot sounds like." Juror No. 9 was listening and participating and it was "(j)ust the nature of his participation was somewhat unattractive at times." The emotional outburst came

on the last day, after all of the jurors had agreed on the verdict, when Juror No. 9 said, "If (the victim) had been white, it wouldn't have taken you so long," which angered some of the other jurors. Although Juror No. 12 was one of the three jurors originally unconvinced beyond a reasonable doubt, Juror No. 12 was actually surprised there had not been more racial tension in the jury room and, when Juror No. 9 made his statement, Juror No. 12 "could see the truth in what he was saying. It wasn't real diplomatic, but that was from his frame of mind. I think that was certainly a possibility."

*Juror No. 2*:

Juror No. 2 stated all jurors participated in the deliberations, "(s)ome more than others," and that Juror No. 9 would often not say anything, but "every once in a while, he would contribute what he thought was important." Although he had his back to [the] group most of the time, he was not inattentive and "you could tell that he was listening . . . (from) his body language." Juror No. 2 said the outburst came at the end of the deliberations. At that point, when the vote was 11 to 1 in favor of conviction, the last hold-out (apparently seeing the handwriting on the wall) started to cry and said, "I just wish there is some other way. It is so hard to say this. It is obvious, but I wish there was some other way." Juror No. 9 got really annoyed and said, "If this had been a white boy that had been killed by two black boys, he would have been tried and hung by now," and when the others chastised Juror No. 9 for that comment, he said, "if the shoe fits, wear it." Other than that occasion, the race of the victim and the defendants was not mentioned in the deliberations.

(Lodgment No. 12, <u>People v. Berardi, et al.</u>, No. D056544, slip op. at 13-17.)

The trial judge denied the motion for a new trial after applying a three-part inquiry asking whether the evidence submitted was admissible, and, if so, whether it established misconduct, and, if so, whether the misconduct was prejudicial, and ruled:

The first step is whether or not the court can consider or make a determination as to what evidence it can consider in the matter and hold an evidentiary hearing where we can make a determination as to what took place.

I think, in reviewing many of the statements of the jurors, we have really a mixed bag of admissible and potentially inadmissible evidence. There are a lot of statements attributed to juror number 9 that isolated in and of themselves probably would not be admissible, clearly reflecting on the mental processes of that particular juror in reaching a determination in the case.

When we brought in a whole series of jurors to give us their opinions, I was clearly inviting, in essence, them to violate exactly what the law suggests I cannot do, but I thought it was – in the big picture, it was more important for us to find out what, if anything, had taken place. And to do so, we were, in essence, required to somewhat delve into the thought processes or effects that certain statements would have.

To the extent that the people suggest that the motion can be denied at step one without going further, I think is unsupported by the evidence in our particular case. Therefore, step one was not a stumbling block to granting the motion, or at least hearing the motion.

Step two was certainly the most difficult for the court, and that was to make a determination whether there was any actual misconduct in the case.   [¶] Gentlemen, I concluded early on that there was not.

There's lots of speculation as to what might or might not have been said, when certain things were said, when they weren't said, for purposes of deliberation; whether or not a chance observation by someone of Juror 9, who, for the record, was African-American, having some type of interaction with what this particular witness perceived to be [the victim]'s family members.  But there's nothing to suggest that in and of itself constitutes misconduct upon which we'd set aside the verdict in this particular case.

We never really got past step two.

There appears not to have been misconduct.  Certainly the way that Juror number 9 conducted himself for purposes of deliberation is not the way we'd like to see it handled.  I think it would have been more appropriate had he been more courteous to those involved in deliberations.  But all the jurors that, in essence, came back and testified never said that he was inattentive, never said that he was not paying attention, and never said that he somehow disregarded the law.  He reached his conclusion very early on in the case.  He was confrontational at times with other juror members, but that's nothing more than we see in murder juries all the time.  That's why we have 12 different people in there to come up with a decision in the case.

And none of the jurors, notwithstanding the spin, frankly, that either side put on what was said by these panel members who did come back in, it's unfortunate that whoever is going to review that is not going to have had the opportunity that we've had to actually see the people talk and hear the answers to the questions that were posed.  Frankly, for what it's worth, there was nothing in any statement made by any of those witnesses in response to any question I posed to them to suggest to me that Juror 9's activity was anything more than an unpleasant, in addition to an already unpleasant, experience having to sit on a murder case.   It simply did not affect their decision-making in any way whatsoever.  They didn't like it, but they didn't let it affect them.

The motion is denied.  You never get past step two.

(RT 2022-25.)

On October 30, 2009, the trial court, for the same reasons, denied a second new trial motion based on (i) refusing to allow defense counsel to object or cross-examine the jurors during the hearing, and (ii) improperly inquiring into the deliberative process of the jurors and improperly using that testimony to determine that the jurors were not influenced by any potential misconduct.  (RT 2032-38.)

Petitioner presented his juror bias claim to the state supreme court in his petition for review.  (Lodgment No. 14.)  The Court will look through the silent denial by the state supreme court to the last reasoned decision, the opinion of the state appellate court, which stated:

We conclude the trial court did not abuse its discretion in denying the motions for new trial. May and Berardi's first set of claims—that Juror No. 9 was inattentive or refused to deliberate—was rejected by the trial court, and the jurors' answers to the questions posed by the parties provide ample evidentiary support for the trial court's factual finding. Although Juror No. 9 may have elected to seat himself in a discourteous manner, he was not physically separating himself from the other jurors to avoid participating. [FN10] To the contrary, Juror No. 5 affirmed that, while Juror No. 9 was acting "aloof . . . with his back turned to us, *he was participating* . . . and he did contribute some in the arguing" (italics added), and Juror No. 2 stated that even when Juror No. 9 had his back to the group he was *not* inattentive and "*you could tell that he was listening* . . . [from] his body language." (Italics added.) Moreover, the fact that Juror No. 9 was an early advocate for conviction, and may have been uninterested in viewing a security tape toward the end of the deliberations, does not equate with a "refusal to deliberate." In *People v. Cleveland* (2001) 25 Cal.4th 466, the Supreme Court (dealing with the analogous problem of whether a juror may be discharged for misconduct because he does not deliberate) defined the phrase "refusal to deliberate" to mean a juror's "unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Id.* at p. 485.) Importantly, the *Cleveland* court noted the circumstance that a juror does not deliberate well or relies on faulty logic or analysis does not constitute a refusal to deliberate and, similarly, "the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussions will not alter his or her views." (*Ibid.*)

> FN10:  Berardi, noting the evidence that Juror No. 9 declined invitations from other jurors to lunch with them during trial, suggests this was further evidence that he was trying to separate himself from other jurors. However, there are multiple reasons Juror No. 9 may have chosen to spend his lunch break on his own (e.g., running his business, meeting friends or family for lunch, shopping, etc.), all of which are much more benign than the nefarious inference Berardi urges.

The principal argument by May and Berardi is that Juror No. 9 held racially-based biases against the defendants so that he was unable to perform his duty as a juror, which amounted to misconduct. [FN11] However, the courts have repeatedly held bias will not be presumed and an alleged bias that renders a juror unable to perform his or her duty as a juror must appear in the record as a "demonstrable reality." (See, e.g., *People v. Beeler* (1995) 9 Cal.4th 953, 975; *People v. Holloway* (2004) 33 Cal.4th 96, 124–125.) The only overt evidence cited by May and Berardi to support their claim that Juror No. 9's racial prejudice rendered him unable to perform his duty as a juror was the single comment by Juror No. 9 that he believed the jury would have reached a verdict much more quickly had the case involved a white man shot by a black man. [FN12] However, the evidence showed this statement was the *only* reference *ever* made by Juror No. 9 to the respective races of the parties. Moreover, the evidence

-48-

showed Juror No. 9's statement came after lengthy deliberations [FN13] and could well be understood to reflect his bewilderment that, in what appeared to him to be a clear case (where May *confessed* to the shooting and Tong's testimony clearly showed Berardi *orchestrated* Kegler's rendezvous with May and had foreknowledge of the need for an alibi), the lone hold-out was still reluctant to convict the defendants.  Indeed, because the evidence appeared to show his comment came only after these lengthy deliberations had moved the vote to 11 to 1 in favor of conviction, and was in response to the last hold-out's crying and saying, "I just wish there is some other way. . . . *It is obvious*, but I wish there was some other way" (italics added), it appears Juror No. 9's comment did not reflect any racial bias that rendered *him* unable to perform his duty as a juror, but instead was a vocalization of his perception that *other* jurors were unduly reluctant to perform their duties to convict the defendants.

FN11:  Berardi also argues the order denying the new trial motions must be reversed because the court improperly admitted and considered evidence from the jurors reflecting on the jury's decisionmaking process, because the court asked each juror whether they were intimidated by Juror No. 9's outburst, and the court found Juror No. 9's alleged misconduct "had virtually no impact" on the jury's decisionmaking process, "did not improperly influence or sway any particular juror," and did not compel any juror "to vote one way or the other."  Certainly, the courts have ordinarily limited evidence challenging a jury's impartiality to evidence of statements made, or conduct, conditions, or events occurring in the jury room of such a character as is likely to have influenced the verdict improperly, but cautioned that "'(n)o evidence is admissible to show the (*actual*) *effect* of such statement, conduct, condition, or event upon a juror . . . or concerning the *mental processes* by which (the verdict) was determined.'" (*In re Hamilton, supra*, 20 Cal.4th at p. 294, italics added by *Hamilton*.)  However, the questions posed by the court were largely agreed on by the defense, and therefore any alleged error as to the admission of the evidence must be deemed invited.  More importantly, Berardi affirmatively alleged a new trial was warranted because Juror No. 9's conduct intimidated the jury into convicting Berardi, and thus invited the court to make the findings he now criticizes on appeal.  We conclude any error in the admission of the evidence or the findings made below was invited error.

FN12:  Berardi attempts to buttress his claim of racial bias by inferring that other comments and actions by Juror No. 9 were attributable to racial bias.  For example, Berardi cites Juror No. 12's testimony-that Juror No. 9 said, "In my neighborhood, we know what a gunshot sounds like," and gave nonverbal indications that he thought the other jurors were naïve compared to his own experience-as showing Juror No. 9 was biased.  However, such comments do not constitute misconduct.  "Indeed, lay jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process.  'That they do so is one of the strengths of the jury system.  It is also one of its weaknesses . . . . Such a weakness, however, must be tolerated.'" (*People v. Pride* (1992) 3 Cal.4th 195, 268.)  May argues Juror No. 9's racial bias was buttressed by the allegation that, on the morning Berardi's counsel was scheduled to give his closing argument, Juror No. 9 was seen sitting outside the courtroom (apparently waiting for

proceedings to begin) and was in the vicinity of Kegler's family and the witness "(thought) he was engaged in (Kegler's) family's conversation." However, the court questioned each juror about that allegation, and all denied any knowledge of improper contact, and the court found that allegation lacked any corroboration.

FN13: Jury deliberations began on the afternoon of January 13, 2009, and did not conclude until January 22, 2009, and involved nearly four full days of deliberations.

Because the evidence does not show, as a "demonstrable reality," that Juror No. 9 was unable to adjudge the matter impartially, we reiterate our high court's caution that "before a unanimous verdict is set aside, the likelihood of bias . . . must be *substantial.* . . . (T)he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. (Citation.)  Jurors are not automatons.  They are imbued with human frailties as well as virtues.  If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.  To demand theoretical perfection from every juror during the course of a trial is unrealistic." (*In re Carpenter, supra,* 9 Cal.4th at pp. 654–655.) On this record, the trial court did not abuse its discretion in denying the new trial motions because the record did not show as a demonstrable reality that Juror No. 9 was actually biased or that he refused to deliberate or follow the court's instructions.

(Lodgment No. 12, <u>People v. Berardi, et al.</u>, No. D056544, slip op. at 18-22.)

A criminal defendant has a Sixth Amendment right to a "fair trial by a panel of impartial, 'indifferent' jurors."  <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  <u>United States v. Hendrix</u>, 549 F.2d 1225, 1227 (9th Cir. 1977).  The Ninth Circuit has stated that:

A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances.  An informal in camera hearing may be adequate for this purpose; due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality.  So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.

<u>Dyer v. Calderon</u>, 151 F.3d 970, 974-75 (9th Cir. 1998) (en banc) (internal citations omitted).

Federal habeas courts must apply Federal Rule of Evidence 606(b) when evaluating juror bias claims.  <u>Anderson v. Terhune</u>, 409 Fed.Appx. 175, 179 (9th Cir. 2011) ("Federal Rule of Evidence 606(b) governs the admissibility of juror testimony in federal habeas proceedings."), citing <u>McDowell v. Calderon</u>, 107 F.3d 1351, 1367 (9th Cir. 1997), vacated in part on other

grounds, 197 F.3d 1253 (9th Cir. 1999); but see Williams v. Price, 343 F.3d 223, 230 n. 3 (3rd Cir. 2003) (disagreeing with cases from the 2nd, 4th, 7th and 9th Circuits which hold that Rule 606(b) applies in federal habeas proceedings to juror testimony taken in state court, and finding that state court proceedings are not governed by the Federal Rules of Evidence).  In Warger v. Shauers, 574 U.S. ___, 135 S.Ct. 521 (2014), the Supreme Court clarified that Rule 606(b) precludes use, during a hearing into the validity of a verdict, of any statement made by a juror during deliberations, with exceptions only for extraneous information, outside influence, and mistakes in entering the verdict.  Id. at 527, abrogating Hard v. Burlington Northern R.R., 812 F.2d 482, 485 (9th Cir. 1987) (holding that "[s]tatements which tend to show deceit during voir dire are not barred by [Rule 606(b)].")  Thus, Petitioner cannot rely on Ninth Circuit authority for the proposition that Juror No. 9's failure to disclose bias during voir dire permits the Court to consider the testimony of the other jurors.[3]

It also appears, in light of Warger, that dicta from the Ninth Circuit that evidence of racial bias is exempt from Rule 606(b) is no longer persuasive, except perhaps in extreme cases.  See United States v. Henley, 238 F.3d 1111, 1121 (9th Cir. 2001) ("While we find persuasive those cases that have exempted evidence of racial prejudice from Rule 606(b)'s juror incompetency doctrine, we need not decide today whether or to what extent the rule prohibits juror testimony concerning racist statements made during deliberations or, as in this case, outside of deliberations but during the course of the trial.  Where, as here, a juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations, evidence of that juror's alleged racial bias is indisputably admissible for the purpose of determining whether the juror's responses were truthful."), citing Hard, 812 F.2d at 485; see also Warger, 135 S.Ct. at 529 n.3 ("There may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged.  If and when such a case arises, the

---

[3]  A voir dire questionnaire asked: "Everyone has biases, prejudices or preconceived notions. Do you have any that would affect the way you decide this case?  Explain."  (RT 281.)  The record does not appear to include Juror No. 9's response, although the new trial motion states that Juror No. 9 "did not disclose his racial bias" during voir dire.  (CT 1316, 1322.12, 1322.18.)

Court can consider whether the ususal safeguards are or are not sufficient to protect the integrity of the process.")

Petitioner argues that the trial judge erred in finding "virtually no impact" from Juror No. 9's statements and behavior (and by implication the appellate court erred in finding there was no "substantial" likelihood of bias), because <u>any</u> impact from a racially biased juror amounts to federal Constitutional error. (Traverse at 10.) However, "not every incident of juror misconduct or bias requires a new trial. . . . The court must determine if the bias or prejudice amounted to a deprivation of Fifth Amendment (due process) or Sixth Amendment (impartial jury) guarantees. The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." <u>Hendrix</u>, 549 U.S. at 1229 (internal citations and quote marks omitted). The Court finds that the trial judge conducted an adequate inquiry into allegations of misconduct and bias by Juror No. 9 when he held a hearing at which six of the twelve jurors voluntarily appeared and were questioned by the trial judge from a list of questions submitted by the parties, and reasonably found no prejudice to Petitioner. Although defense counsel objected that the inquiry was inadequate because he did not have an opportunity to cross-examine the jurors, there has been no showing, here or in the state court, what additional evidence, admissible or not, could have been obtained which might have altered the finding that there was no bias or misconduct, or the finding that any bias or misconduct which might have occurred did not rise to the level of a federal Constitutional violation. To the extent Petitioner is correct that the trial court improperly inquired into the mental process of the jurors, or improperly used that testimony to determine whether any potential misconduct affected their verdict, Petitioner has not shown that Juror No. 9's statements or conduct by themselves, without consideration of the jurors' testimony regarding the lack of effect on their verdict, is sufficient to show bias. <u>See</u> <u>Fields v. Brown</u>, 503 F.3d 755, 767 (9th Cir. 2007) (holding that juror bias is defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.")

To the extent Petitioner contends the adjudication of Claim 3 by the state appellate court was contrary to clearly established federal law because it relied on the testimony of the jurors,

he has not shown that clearly established federal law requires state courts to follow Rule 606(b). See e.g. Price, 343 F.3d at 237-39 (rejecting contention that clearly established federal law makes Rule 606(b) applicable to the states), citing Burgett v. Texas, 389 U.S. 109, 113-114 (1967) ("The States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution.")[4]

Even assuming Petitioner is correct that it is reasonable to interpret the statements and actions attributed to Juror No. 9 as being the type that could lead to an inference that he was not able to act with entire impartiality, habeas relief is not available as long as the state court's opposite finding is also reasonable. Woodall, 134 S.Ct. at 1706-07 (holding that relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."), quoting Richter, 562 U.S. at 103. As set forth above, the trial judge found that Juror No. 9's outburst was nothing more than an unpleasant reaction to an unpleasant situation typical of jury service on a murder trial, and observed that it is unfortunate that any reviewing court would not have the same opportunity as the trial judge to observe the jurors' testimony in that regard. See Miller v. Fenton, 474 U.S. 104, 114 (1985) (holding that a state trial judge is in a far superior position to assess juror bias than federal habeas judges); see also Austad v. Risley, 761 F.2d 1348, 1350 (9th Cir. 1985) ("The Supreme Court has clearly established that the determination of a juror's partiality or bias is a factual determination to which section 2254(d)'s presumption of correctness applies."), citing Patton v. Yount, 467 U.S. 1025, 1036 (1984).

Accordingly, the Court finds that the trial court conducted an adequate inquiry into the allegations of bias and misconduct, and that the appellate court's adjudication of the claim on

---

[4] To the extent Rule 606(b) applies in state court to the state court's adjudication of Petitioner's federal claim, the appellate court, by relying on the statements made by the jurors regarding their deliberations, would have issued a decision that was contrary to clearly established federal law. See Williams, 529 U.S. 405-06 (holding that a state court's decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases.") In such a case, this Court must conduct a de novo review of Claim 3, and may only grant relief if a federal Constitutional violation occurred. Fry, 551 U.S. at 119-22. This Court need not make that determination, however, because, as set forth below, under a de novo review Claim 3 fails for lack of evidentiary support.

the basis that there was no showing of bias or misconduct sufficient to rise to the level of a federal Constitutional violation is objectively reasonable within the meaning of 28 U.S.C. § 2254(d)(1)-(2).  The Court alternately finds that, to the extent this Court is precluded by Federal Rule of Evidence 606(b) from considering the testimony of the jurors, there is no evidence of juror bias or misconduct before this Court, and Claim 3 fails under a de novo review for lack of evidentiary support.  <u>Warger</u>, 135 S.Ct. at 527.  Although <u>Warger</u> recognized that extreme cases of bias might permit the Court to consider juror testimony, the Court finds that Petitioner has not alleged facts which, if true, and if this Court were able to consider the jurors' testimony, rise to such an extreme level.  The state court correctly observed that the statements by Juror No. 9 expressed a belief that the other jurors were racially biased, not that he harbored racial bias incapable of allowing him to perform his duty as a juror.  The state court also correctly found they were an understandable expression of frustration made at the end of lengthy deliberations at a time when the last hold out juror indicated that proof of guilt was obvious.  The Court recommends habeas relief be denied as to Claim 3.

**E.     Claim 4**

Petitioner next alleges his federal Constitutional rights were violated because the trial judge considered evidence of the jurors' deliberative processes and held the hearing where the jurors testified outside Petitioner's presence in violation of his right to be present at all critical phases of the trial.  (Pet. at 9, 27-28.)  Respondent answers that the rejection of this claim by the state appellate court was neither contrary to nor based on an unreasonable application of clearly established federal law because there is no clearly established federal law precluding a state court from inquiring into the jurors' deliberative processes.  (Ans. Mem. at 24-28.)

Petitioner presented this claim to the California Supreme Court in a habeas petition which was denied without citation of authority or a statement of reasoning.  (Lodgment Nos. 20-21.) Petitioner presented the claim to the state appellate court in a habeas petition (Lodgment No. 18), which the appellate court denied, stating:

> May's second contention is that the trial court relied on inadmissible evidence in its order denying his motion for new trial premised on a claim of juror bias.  This court considered this contention on direct appeal and found that any error in the admission of inadmissible evidence or the court's findings was invited

error.  A petition for a writ of habeas corpus based on a same ground as one on appeal will be denied as repetitive where there has been no change in the facts or law substantially affecting the rights of the petitioner. (*In re Martinez* (2009) 46 Cal.4th 945, 950, fn. 1.)  May does not show any such change here.

(Lodgment No. 19, In re May, No. D064374, order at 1-2.)

As set forth above in the discussion of Claim 3, the appellate court on direct appeal stated:

Berardi also argues the order denying the new trial motions must be reversed because the court improperly admitted and considered evidence from the jurors reflecting on the jury's decisionmaking process, because the court asked each juror whether they were intimidated by Juror No. 9's outburst, and the court found Juror No. 9's alleged misconduct "had virtually no impact" on the jury's decisionmaking process, "did not improperly influence or sway any particular juror," and did not compel any juror "to vote one way or the other."  Certainly, the courts have ordinarily limited evidence challenging a jury's impartiality to evidence of statements made, or conduct, conditions, or events occurring in the jury room of such a character as is likely to have influenced the verdict improperly, but cautioned that "'(n)o evidence is admissible to show the (*actual*) *effect* of such statement, conduct, condition, or event upon a juror . . . or concerning the *mental processes* by which (the verdict) was determined.'" (*In re Hamilton, supra*, 20 Cal.4th at p. 294, italics added by *Hamilton*.)  However, the questions posed by the court were largely agreed on by the defense, and therefore any alleged error as to the admission of the evidence must be deemed invited.  More importantly, Berardi affirmatively alleged a new trial was warranted because Juror No. 9's conduct intimidated the jury into convicting Berardi, and thus invited the court to make the findings he now criticizes on appeal.  We conclude any error in the admission of the evidence or the findings made below was invited error.

(Lodgment No. 12, People v. Berardi, et al., No. D056544, slip op. at 20, n. 11.)

Petitioner first contends the error was not invited because he was not present when the hearing was held, and although he had waived his presence for the juror interviews, his waiver was invalidated by the trial judge's inappropriate sua sponte questioning of the jurors' mental processes. (Pet. at 28.)  Respondent does not argue the claim is procedurally defaulted by virtue of the appellate court's finding that any error was invited.  Rather, Respondent argues there is no clearly established federal law which limits a state court's ability to inquire into the deliberative processes of the jurors. (Ans. Mem. at 27.)  Respondent also contends the state court correctly found that although Juror No. 9's manner was confrontational, it was nothing more than could be expected from the usual unpleasantness of a murder trial, and that this Court is bound by that determination.  (Id.)

Claims based on state evidentiary rulings are not cognizable in a federal habeas proceeding unless the exclusion of the evidence was so prejudicial that it rendered a trial fundamentally unfair. <u>McGuire</u>, 502 U.S. at 70-73; <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 897 (9th Cir. 1996); <u>Jammal</u>, 926 F.2d at 919-20. Petitioner has failed to show that the use of the evidence of the jurors' deliberative processes rendered his trial fundamentally unfair. As discussed above with respect to Claim 3, without the evidence Petitioner objects to there is no evidence whatsoever supporting a finding of bias or misconduct. Even were the Court to find that consideration of that evidence by the state court rendered its adjudication of the claim objectively unreasonable, and thereby permit this Court to review the claim de novo, the Court would reject Petitioner's claim of juror bias and misconduct for the reasons set forth above in Claim 3. Accordingly, the Court finds habeas relief is not available as to the aspect of Claim 4 alleging improper use of evidence of the jurors' deliberative processes because the state court adjudication of the claim is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), and alternately, because a de novo review of the claim fails to establish a federal Constitutional violation. <u>McGuire</u>, 502 U.S. at 70-73; <u>Pirtle</u>, 313 F.3d at 1167-68; <u>Hayes</u>, 399 F.3d at 978.

The state court did not specifically address Petitioner's contention, which was raised in the state supreme court habeas petition (<u>see</u> Lodgment No. 20 at 21 [ECF No. 13-58 at 28]), that although he waived his right to be present at the hearing where the jurors testified, the waiver was nullified when the trial judge overstepped what Petitioner could have reasonably expected at such a hearing by inquiring into the jurors' deliberative processes. (Pet. at 27-28.) Because there is no reasoned state court decision addressing this claim, the Court must consider the state supreme court's silent denial as a ruling on the merits, and "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Richter</u>, 562 U.S. at 102.

Clearly established federal law provides that a criminal defendant has the right to be present at any stage of his criminal proceedings that is critical to its outcome if his presence would contribute to the fairness or reliability of the procedure. <u>Kentucky v. Stincer</u>, 482 U.S.

730, 745 (1987).  It is also clearly established that a defendant can waive his right to be present, Diaz v. United States, 223 U.S. 442, 455 (1912), and that a violation of that right is subject to harmless error review.  Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc).

Petitioner admits he waived his right to be present during the jurors' testimony, although he states he did so with the understanding that the trial judge would not inquire into the jurors' deliberative processes.  (Pet. at 27-28.)  However, even if that waiver was somehow rendered invalid by the trial judge's inquiry into the jurors' deliberative processes, Petitioner has not shown how his presence would have contributed to the fairness of the proceeding.  In addition, as discussed above, it was only by asking the jurors about their deliberative processes that the trial judge could possibly have determined whether juror bias was present and whether it affected the deliberations.  The state supreme court could reasonably have denied this claim on the basis that Petitioner has not shown a reasonable probability that had he been present at the hearing the outcome of the proceedings would have been any different.

The Court finds the state court adjudication of Claim 4 is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court recommends habeas relief be denied as to Claim 4.

## F.    Claim 5

Petitioner alleges in Claim 5 that his federal Constitutional rights were violated by erroneous imposition of the firearm use sentence enhancement.  (Pet. at 31-34.)  Specifically, he argues that the consecutive 25 years-to-life term imposed as a result of the enhancement violated due process because it extended his sentence beyond what is statutorily permissible within the meaning of Apprendi v. New Jersey, 530 U.S. 466 (2000) (holding that other than the fact of a prior conviction, any fact used to increase a sentence above the statutory maximum must be found by a jury beyond a reasonable doubt).  (Id.)  He also claims the enhancement violated double jeopardy principles because it was not a separate crime, but merely the means for which the murder was committed without an allegation of illegal firearm use, and was in fact activity protected under the Second Amendment.  (Id.)

Respondent answers that relief is not available to the extent this claim only alleges a violation of state law. (Ans. Mem. at 29.) Respondent contends the <u>Apprendi</u> principles were not violated because the jury found the enhancement had been proven beyond a reasonable doubt. (<u>Id.</u>) Respondent also contends that although double jeopardy principles protect against imposition of a greater punishment than a legislature intended, the California legislature intended to increase punishment when a firearm is used to commit murder. (<u>Id.</u>)

Petitioner presented this claim, in the same manner it is presented here, to the state supreme court in a habeas petition. (Lodgment No. 20 at 27-31 [ECF No. 13-58 at 34-38].) That petition was summarily denied without citation of authority or statement of reasoning. (Lodgment No. 21.) Petitioner did not present the federal Constitutional aspects of this claim in the habeas petitions he filed in the state appellate and superior courts, but merely alleged imposition of the enhancement violated California Penal Code section 654. (Lodgment No. 18 at 22-24 [ECF No. 13-56 at 37-39]; Lodgment No. 16 at 22-24 [ECF No. 13-51 at 41-43].)

The appellate court denied the claim, stating:

> May's third contention is that the sentence for the firearm enhancement (Pen. Code, § 12022.53(d)) should have been stayed pursuant to Penal Code section 654 because the enhancement sentence arose from the same conduct as the first degree murder count. California courts have repeatedly rejected this same contention. (See, e.g., *People v. Sanders* (2003) 111 Cal.App.4th 1371, 1375.)

(Lodgment No. 19, <u>In re May</u>, No. D064374, order at 2.)

Respondent is correct that to the extent Petitioner contends the state court violated state law in imposing sentence, his claim is not cognizable on federal habeas. <u>McGuire</u>, 502 U.S. at 67-68. However, Petitioner presented the federal Constitutional aspects of this claim to the state supreme court, and, because there is no lower state court reasoned decision, this Court must treat the silent denial by the state supreme court as a ruling on the merits of the federal Constitutional claims. See <u>Richter</u>, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") This Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  Id. at 102.

The state supreme court could have reasonably denied Petitioner's Apprendi claim on the basis that the jury returned a verdict finding that the enhancement had been proven beyond a reasonable doubt.  See Apprendi, 530 U.S. at 490 (holding that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the proscribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); see also Blakely v. Washington, 542 U.S. 296 (2004) (holding that the statutory maximum for Apprendi purposes is the maximum sentence permitted to be imposed solely by the jury verdict or a defendant's admission).

The state supreme court could have reasonably denied Petitioner's double jeopardy claim on the basis that imposition of the sentence on the firearm use enhancement in addition to the sentence on first degree murder does not violate double jeopardy principles.  See Plascencia v. Alameida, 467 F.3d 1190, 1204 (9th Cir. 2006) (holding that imposition of a term of 25 years to life for firearm use in addition to 25 years to life for first degree murder did not violate double jeopardy principles because it was consistent with the intent of the California legislature), citing Missouri v. Hunter, 459 U.S. 359, 366 (1983); see also Edwards v. Swarthout, 552 Fed.Appx. 715, 716 (9th Cir. 2014) ("The California appellate court properly concluded that [a sentence enhancement for personally inflicting great bodily injury is] not 'multiple punishment[]' within the meaning of the double jeopardy prohibition."), citing Monge v. California, 524 U.S. 721, 728 (1998) and Witte v. United States, 515 U.S. 389, 397 (1995).

The state supreme court could have reasonably rejected Petitioner's contention that his use of a handgun to murder Marcus Kegler was lawful protected Second Amendment activity on the basis that the Second Amendment is subject to reasonable restrictions.  See District of Columbia v. Heller, 554 U.S. 570, 626 (2008) ("Like most rights, the right secured by the Second Amendment is not unlimited.")

Accordingly, the Court finds that the state court adjudication of Claim 5 is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based

on an unreasonable determination of the facts.  The Court recommends habeas relief be denied as to Claim 5.

**G.      Claim 6**

Petitioner alleges in Claim 6 that his federal Constitutional rights were violated by ineffective assistance of appellate counsel in failing to raise Claims 1, 4 and 5 here.  (Pet. at 35-38.)  He also contends appellate counsel failed to raise claims of ineffective assistance of trial counsel based on trial counsel's failure to object to the jury instructions or the trial judge's response to the jury questions as set forth in Claim 2 here.  (Id.; Traverse at 12.)

Respondent answers that because the state court found the underlying claims to be without merit, the adjudication of this claim by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Ans. Mem. at 29-30.)

Petitioner presented this claim to the state supreme court in a habeas petition.  (Lodgment No. 20 at 31-32 [ECF No. 13-58 at 38-39].)  That petition was summarily denied without a statement of reasoning.  (Lodgment No. 21.)  He also presented it to the state appellate court in a habeas petition.  (Lodgment No. 18 at 24-26 [ECF No. 13-56 at 39-41].)  The Court will apply § 2254(d) to the appellate court order denying the claim, which stated:

> May's final contention is that his appellate counsel was ineffective in failing to raise these contentions on direct appeal.  Because the contentions have no merit, his counsel's performance was not deficient.

(Lodgment No. 19, In re May, No. D064374, order at 2.)

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable."  Id.  To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the

-60-

outcome." Id.  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel.  Id. at 687.  The Strickland standard applies to claims of ineffective assistance of appellate counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000).

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  "The standards created by Strickland and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted).  These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, ___, 131 S.Ct. 1388, 1398 (2011).  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Richter, 562 U.S. at 110, quoting Strickland, 466 U.S. at 686.  Federal habeas functions as a "guard against extreme malfunctions in the state criminal justice systems," and not as a means of error correction.  Id., at 102-03, quoting Jackson, 443 U.S. at 332 n.5.

As discussed above, the claims Petitioner contends his appellate counsel should have raised on appeal, Claims 1, 4 and 5, are without merit.  As discussed above in Claim 2, Petitioner has not shown a reasonable probability of a different outcome if his trial counsel had objected to the instructions as given, or to the trial judge's answer to the jury question.  Thus, Petitioner has not shown that the appellate court's denial of this claim involved an unreasonable application of the Strickland standard.  See Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding that where "trial counsel's performance, although not error-free, did not fall below the Strickland standard," no prejudice arose from appellate counsel's failure to raise the issue on appeal); Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance).

The Court finds that Petitioner has not shown that the state appellate court adjudication of Claim 6 is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts.  The Court recommends denying habeas relief on Claim 6.

/ /

**H.    Claim 7**

Finally, Petitioner alleges in Claim 7 that he is entitled to an evidentiary hearing in this Court in order to determine whether any error, or the cumulative effect of the errors, warrants habeas relief.  (Pet. at 39-41; Traverse at 12.)  Respondent answers that an evidentiary hearing is not necessary because Petitioner's claims can be decided on the basis of the existing record, and because the analysis of Petitioner's claims must be limited to the record that was before the state court. (Ans. Mem. at 30-31.)  Respondent also contends that Petitioner was not prejudiced by cumulative error because there are no errors to accumulate.  (Id. at 31.)

**1.  Cumulative Error**

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 290 n.3 (1973).  "The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair."  Parle, 505 F.3d at 927, citing Chambers, 410 U.S. at 298.  Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."  Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988).  "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors."  Frederick, 78 F.3d at 1381.

As recounted above, the case against Petitioner was not weak.  Strong evidence was presented that he conspired with Berardi to lure the victim to the cul-de-sac under the guise of a drug deal too good to resist in order to commit deliberate and premeditated murder.  The evidence of justifiable homicide was weak, consisting entirely of Petitioner's self-serving statements, which were contradicted by Petitioner calling Berardi and confirming that "the pizza had been delivered" rather than alerting Berardi that the drug deal had not gone according to

plan and that he was forced to shoot the victim.  Petitioner has not shown that the cumulative effect of the alleged errors (the denial of his motion for acquittal, instructional error, ineffective assistance of trial counsel in failing to object to the alleged instructional error or the answer to the jury question, the presence of a biased juror, delving into the jurors deliberative processes, sentencing on the firearm use enhancement, ineffective waiver of his right to be present when the jurors testified, and his appellate counsel's failure to raise some of those claims on appeal), prejudiced him or rendered his trial fundamentally unfair.  The Court therefore recommends habeas relief be denied as to the cumulative error aspect of Claim 7.

## 2. Evidentiary Hearing

An evidentiary hearing is not necessary where, as here, the federal claims can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief.  Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994); see also Pinholster, 131 S.Ct. at 1398 (holding that for claims which were adjudicated on the merits in state court, a federal habeas court must make its § 2254(d) determination based solely on the evidence presented to the state court).  The Court finds that an evidentiary hearing is neither necessary nor warranted to address Petitioner's claims, and recommends denying Petitioner's request for an evidentiary hearing.

## I.     Proper Respondent.

Finally, Respondent argues that Kamala Harris, the California Attorney General, is not a proper respondent to this action.  (Ans. Mem. at 17.)  Rule 2 of the Rules following § 2254 provides that the state officer having custody of the petitioner shall be named as respondent. Rule 2(a), 28 U.S.C. foll. § 2254.  However, "[i]f the petitioner is not yet in custody – but may be subject to future custody – under the state-court judgment being contested, the petition must name as respondents both the officer who has current custody and the attorney general of the state where the judgement was entered."  Rule 2 (b), 28 U.S.C. foll. § 2254.

Here, Petitioner agrees with Respondent that there is no basis to name the Attorney General as a respondent in this action.  (Traverse at 8.)  Accordingly, the Court recommends dismissing Kamala Harris as a named respondent to this action.

# VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgement be entered denying Petitioner's request for an evidentiary hearing, denying the Petition, and dismissing Kamala Harris as a Respondent.

**IT IS ORDERED** that no later than **October 14, 2015** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **October 23, 2015**. The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**DATED:**   September 25, 2015

_____

**HON. JAN M. ADLER**
**UNITED STATES MAGISTRATE JUDGE**

14cv2038